OAKLAND SUGAR MILL CO. v. FRED W. WOLF CO.

DETROIT SUGAR CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. October 7, 1902.)

Nos. 1,060, 1,061.

1. FOREIGN CORPORATIONS—MICHIGAN FRANCHISE ACT—VALIDITY OF CONTRACTS.
   The Michigan franchise tax act of 1891 (Comp. Laws Mich. 1897, § 8574) requires, inter alia, every foreign corporation "which shall hereafter be permitted to transact business in this state" to pay a franchise fee, and provides that all contracts made in the state "by any corporation which has not first complied with the provision of this act shall be wholly void." As construed by the supreme court of the state, such statute has no application to a foreign corporation whose business relates entirely to interstate commerce, but imposes a tax upon the franchise or privilege of carrying on business within the state. *Held*, that as so construed the statute is within the power of the state and enforceable as applied to a foreign private business corporation which commences

¶ 1. Taxation of foreign corporations, see note to McCanna & Fraser Co. v. Citizens' Trust & Surety Co., 24 C. C. A. 13.

business in the state with the purpose of transacting or carrying it on, and if it does so without first paying the required tax the act renders all contracts made in the state in the conduct of such business void, but that it is not intended to apply to a single contract made by a foreign corporation which is not of a character to indicate a purpose to engage in business in the state.

**2. SAME—DOING BUSINESS IN STATE.**

The question whether a foreign corporation is engaged in "transacting" or "carrying on" business in Michigan, so as to be subject to the penalty imposed by the state statute for failure to pay a franchise tax, is one of fact, to be determined by the jury, unless the evidence is undisputed, and but one inference can be drawn from it.

**3. ACTION FOR PRICE OF MACHINERY—DEFENSE OF BREACH OF WARRANTY—ESTOPPEL.**

Plaintiff furnished and installed for defendant the machinery for a large sugar mill under a contract which warranted the capacity of the plant, and that the machinery and appliances should be first class and of the most approved designs. A portion of the purchase money was to be withheld for 60 days after the mill went into operation, during which time defendant was to have full opportunity for inspection. In fact, no demand for payment was made until it had been operated during a full season under plaintiff's superintendence, and its capacity shown to meet the warranty. Defendant then presented a written list of alleged defects, which it afterward twice added to. Plaintiff remedied the most of the defects claimed, but a few it disputed, and on defendant's refusal to pay the remainder of the contract price until they were remedied brought suit for the same. *Held*, that defendant was not entitled to prove as breaches of the contract other defects not complained of before suit, upon a claim that they were not known until afterward, there being no offer to show that they were latent, and could not have been discovered by reasonable diligence.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is an action of assumpsit brought by the Fred W. Wolf Company, an Illinois corporation, against the Oakland Sugar Mill Company, a Michigan corporation. The cause of action arose upon a written contract dated January 27, 1899. The contract is of great length. In substance its provisions were as follows:

(1) The contractor, the Wolf Company, undertook, at its own expense, to furnish all the engines, boilers, machinery, tools, implements, appliances, and appurtenances, and the materials therefor, and perform all the work necessary to fully equip a beet sugar factory upon lands of the owner, of a sufficient power and capacity to manufacture sugar from 500 tons of beets each 24 hours, and to set up and install the same and put the same in operation. The plans and specifications are to be furnished by the contractor, and shall be subject to acceptance and approval of owner. "The owner shall have the right to employ competent men to inspect said material, machinery, etc., and to inspect the installation and operation thereof during the progress of the work, and all reasonable facilities for such inspection shall be furnished by the contractor to the owner."

(2) The contractor to furnish the owner with four sets of blue prints, complete building plans, and specifications for the buildings required for said factory.

(3) The contractor guaranties that the cost of the granulated sugar produced by the factory for a period during the campaign of 1899, or about 100 days, shall not exceed an average of 3¼ cents per pound. During this campaign the contractor for the purpose of testing the operativeness of the mill, and to carry out this guaranty as to cost and quality of sugar produced,

¶ 2. Foreign corporations "doing business" in state, see note to Wagner v. J. & G. Meakin, 33 C. C. A. 585.

contracted to take entire and absolute control of the mill and all its operations, and make selection of all skilled operatives, the owner to furnish all other help and materials. The test to continue through the season for delivery of beets, and to be at expense of the sugar company. Certain conditions in respect to cost of beets and coal and other materials were also specified.

(4) "All materials, and all workmanship used and furnished by the contractor in the construction of said machinery and appliances and equipments, shall be first class in every respect, and said machinery, appliances, and equipment shall be of the latest and best approved designs and patterns."

(5) The work is to be completed on or before the 1st day of October, 1899.

(6) The owner is to provide the land and buildings required for the factory, to perform the masonry, iron, and carpenter work pertaining to such work, on or before the 1st day of June, 1899. The owner is to perform all masonry and carpenter work in and about the machinery, and is to furnish a railroad switch and the water supply.

(7) The owner shall pay the contractor for machinery, materials, and work the sum of $293,000. The terms of payment are prescribed.

(8) All the property rights in the machinery, etc., are to remain in the contractor until payment is made.

(9) The plant is to be accepted at the close of the campaign of 1899, if it complies with the contract.

(10) The contractor is to protect the owner against liens.

(11) The owner is to maintain insurance against fire.

(12) The contractor is to protect the owner against claims under patents.

(13) The contractor is to furnish a bond, guarantying performance.

(14) Provides that modifications of the contract shall be in writing.

(15) The right of the owner to become purchaser of the machinery, etc., attaches to each article as it is procured.

The plaintiff's declaration avers performance, and charges that defendants did not perform. The bill of particulars credits the defendant with payment of $265,000, but claims a balance due of $28,000, with interest. The defendant pleaded the general issue with notice of special defenses. This notice avers performance by the defendant, and denies performance by plaintiff. It denies that the work done on the machinery and appliances furnished were first class or the mechanism of the latest and best pattern. A large number of defects in the articles and appliances furnished are specifically pointed out. Damages were claimed in a large sum owing to such alleged defective construction. The contract of the Oakland Sugar Company was guarantied by the Detroit Sugar Company. The plaintiff contemporaneously brought suit against the Detroit Sugar Company upon this guaranty. The two suits were tried together, the defenses to the latter being identical with those to the former. There was a jury, and verdict for the plaintiff for $29,627.19, and judgment accordingly in both cases.

H. H. Hatch, for plaintiffs in error.

George W. Moore and Frank H. Scott, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. The principal question arising upon this writ of error concerns the validity of the contract under the Michigan act of 1891, entitled "An act to provide for the payment of a franchise fee by corporations." Pub. Acts 1891, No. 182. The contract in question was made January 27, 1899. The act of 1891, with the amendments then in force, is found as section 8574, Comp. Laws Mich. 1897, and is in these words:

"An act to provide for the payment of a franchise fee by corporations.

"(8574). Sec. 1. The people of the state of Michigan enact, that every corporation or association hereafter incorporated or formed by consolidation or

otherwise, by or under any general or special law of this state, which is required by law to file articles of association with the secretary of state, and every foreign corporation or association which shall hereafter be permitted to transact business in this state, which shall not, prior to the passage of this act, have filed or recorded its articles of association under the laws of this state and been thereby authorized to do business therein, shall pay to the secretary of state a franchise fee of one-half of one mill upon each dollar of the authorized capital stock of such corporation or association, and a proportionate fee upon any and each subsequent increase thereof; and that every corporation heretofore organized or doing business in this state which shall hereafter increase the amount of its authorized capital stock shall pay a franchise fee of one-half of one mill upon each dollar of such increase of authorized capital stock of such corporation or association, and a proportionate fee upon any and each subsequent increase thereof; provided, that the fee herein provided, except in cases of increase of capital stock, shall in no case be less than five dollars; and in case any corporation or association hereafter incorporated under the law of this state, or foreign corporation authorized to do business in this state, has no authorized capital stock, then in such case each and every corporation or association so incorporated or doing business in this state shall pay a franchise fee of five dollars. All contracts made in this state after the first day of January, eighteen hundred ninety-four, by any corporation which has not first complied with the provisions of this act, shall be wholly void."

The Fred W. Wolf Company is confessedly a foreign corporation, which had not complied with this law, and the contract was confessedly made in the state of Michigan. The act, already set out, declares that "all contracts made in this state after January 1, 1894, by any corporation which has not first complied with the provisions of this act, shall be wholly void." To determine the corporations to which this damnatory clause applies, we must look to the whole act, and construe all of its parts together. The words "any corporation," used in the clause, manifestly mean any of the corporations required to pay the franchise tax by the preceding parts of the act.

When we look to see what classes of corporations are required to pay this franchise tax, we find that they consist of two kinds: (a) Domestic corporations thereafter organized or created by consolidation, or who should thereafter increase their capital stock. (b) Foreign corporations thereafter "permitted to transact business in this state," or which should thereafter increase their capital stock.

What foreign corporations are meant by those thus described? If we turn back to the earlier legislation in respect to foreign corporations, and plainly referred to by the act here involved, under which foreign manufacturing and mercantile corporations were authorized to file and record their charters, we find that, by an amendment to the general act authorizing the incorporation of domestic manufacturing and mercantile corporations, corporations of any state or foreign country created for any of the purposes contemplated by the Michigan act might file and record their charters and appoint an agent for service of process, and thereafter "carry on business" in the state, and "enjoy all the rights and privileges, and be subject to all the restrictions and liabilities, of corporations existing under this act." 3 How. Ann. St. § 4161d6, and section 7072, 2 Comp. Laws Mich. 1897. This provision has been construed as simply defining the terms upon which such foreign corporations might, if they should so desire, become entitled to the benefits conferred by the act upon domestic corporations

organized under that act, but as in no wise prohibiting such companies from "doing business" in the state or making their contracts void for noncompliance.   People v. Hawkins, 106 Mich. 479, 64 N. W. 736.

There would seem to be some ground for construing this franchise tax act as requiring the payment of such tax only by such foreign corporations as should voluntarily choose to file and record their charters, and that it had no effect upon the contracts of corporations which had not availed themselves of the privileges of filing and recording their charters.   But the act is in this respect not now subject to our interpretation inasmuch as the supreme court of Michigan has construed it, and held it applicable not only to such foreign corporations as should actually file and record their charters, but to all foreign corporations carrying on or transacting business in the state, whether they choose to avail themselves of the right of registration or not.   Rough v. Breitung, 117 Mich. 48, 75 N. W. 147;  Secretary of State v. National Salt Co. (Mich.) 86 N. W. 124.   In Rough v. Breitung, a contract made in Michigan by a foreign corporation "doing business" in the state was held unenforceable, because it had not paid the franchise tax imposed by this act.   In Secretary of State v. National Salt Co., the Michigan supreme court refused to issue a writ of mandamus requiring the salt company to file and record its charter as a foreign corporation doing business in the state, the court saying:

"If it chooses to do business without compliance with the law, it does it at its risk, and is subject to a suit by quo warranto, or to pay the penalty provided by the law, as was done in Rough v. Breitung, 117 Mich. 48, 75 N. W. 147."

Although the act declares that "all contracts made in this state by any corporation  *  *  *  which has not complied with this law shall be wholly void," yet these words, "all contracts," are not to be construed literally; for this would include contracts in respect of purely interstate commerce, and make the act repugnant to the interstate commerce clause of the federal constitution.   In Coit v. Sutton, 102 Mich. 324, 60 N. W. 690, 25 L. R. A. 819, the act was construed by the Michigan supreme court as having no application to foreign corporations whose business within the state consists in the sale and delivery of goods or commodities made in other states, whether the contract for such sale be made in or out of the state.   This construction of the act excludes purely interstate transactions, and confines its operation to business done or carried on within the state of Michigan. This construction, being that of the highest court of the state as to the scope of the act, is conclusive upon the courts of the United States in a case like this.   Osborne v. Florida, 164 U. S. 650, 17 Sup. Ct. 214, 41 L. Ed. 586;  Wabash, St. L. & P. R. Co. v. Illinois, 118 U. S. 557, 565, 7 Sup. Ct. 4, 30 L. Ed. 244.

It is plain that this statute is intended to put foreign corporations doing business in Michigan upon a like footing with domestic companies in respect to the payment of a franchise tax as a condition to the lawful transacting or carrying on of business in the state.   Neither kind of company is permitted to file and record its articles of association without paying this tax.   The organization of the domestic company could not be completed without filing and recording its articles,

and there could be no filing without the prepayment of this tax. If the foreign company desired to be put upon a plane of equality with domestic companies, it, too, must file and record its charter, and this it could not do without prepayment of the same franchise tax. But, as we have already seen, a foreign company could not be compelled to file its charter or prepay this franchise tax, although doing business in the state. It may, as said by the supreme court of Michigan, do business at its risk, being unable to enforce its contracts as a penalty for nonpayment of this franchise tax. Rough v. Breitung, 117 Mich. 48, 75 N. W. 147. But liability to this penalty is dependent upon the condition that the foreign company whose contract is in question was engaged in "doing," "transacting," or "carrying on business" in the state. Nor, as we have seen, can the tax be exacted of a foreign corporation whose business in the state is limited to taking orders to be executed by the sending of goods into the state from another; for that would be a regulation of interstate commerce, and such regulation is not within the power of any state, and is wholly beyond the scope of this law as construed by the highest court of Michigan. Coit v. Sutton, already cited.

In prescribing the terms and conditions upon which foreign corporations might "carry on" their business in the state, the state did not exceed its reserved powers; for it is well settled that it is entirely competent for a state to prescribe the terms upon which a foreign corporation may enter and transact business in the state. 2 Tuck. Const. U. S. 628; Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137; Horn Silver Min. Co. v. New York, 143 U. S. 305, 12 Sup. Ct. 403, 36 L. Ed. 164; New York v. Roberts, 171 U. S. 658, 664, 19 Sup. Ct. 70, 43 L. Ed. 323.

There is a distinction between the effect and scope of such laws when applicable to corporations organized to carry on interstate business, such as railway and telegraph companies, and laws applying only to corporations organized to conduct a strictly private business, and this distinction is noticed in New York v. Roberts, cited above. The Michigan franchise tax law is intended to apply to strictly business corporations, such as the Fred W. Wolf Company. No tax is sought to be laid, directly or indirectly, upon goods or machinery, imported or domestic, nor on the sale of such goods. It is a tax, said the Michigan supreme court, laid upon "the privilege of doing business in Michigan"; "a tax upon the occupation of the corporation." Coit v. Sutton, 102 Mich. 327, 60 N. W. 690, 25 L. R. A. 819. In New York v. Roberts, 171 U. S. 658, 664, 19 Sup. Ct. 70, 43 L. Ed. 323, a law imposing an annual tax upon the business of foreign corporations carried on in New York was sought to be enforced against a corporation of another state whose stock of merchandise consisted mainly, if not wholly, of articles which were the product of another state or imported from foreign countries. It was objected that, so far as the business consisted in the importation and sale in original packages, no tax could be imposed under the doctrine of Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678. But the court said:

"But that case is inapplicable. Here no tax is sought to be imposed directly on imported articles or on their sale. This is a tax imposed on the

business of a corporation, consisting in the storage and distribution of various kinds of goods, some products of their own manufacture, and some imported articles. From the very nature of the tax, being laid as a tax upon the franchise of doing business as a corporation, it cannot be affected in any way by the character of the property in which its capital stock is invested. Society v. Coite, 6 Wall. 594, 18 L. Ed. 897; Provident Inst. for Savings v. Massachusetts, 6 Wall. 611, 18 L. Ed. 907; Pembina Consol. Silver Min. & Mill. Co. v. Pennsylvania, 125 U. S. 181, 8 Sup. Ct. 737, 31 L. Ed. 650; Home Ins. Co. v. New York, 134 U. S. 594, 10 Sup. Ct. 593, 33 L. Ed. 1025."

If the defendant in error was engaged in "carrying on" business in Michigan, it is immaterial whether a part of the materials, machinery, and appliances furnished in discharge of their contracts for the construction of manufacturing plants were brought or are to be brought from other states. The tax is upon "the business carried on in the state," and the origin of the materials and machinery used in carrying on such business cuts no figure; for the tax is not upon articles imported, but on the "business" done in the state.

But the plain purpose of the law is not to compel the payment of a franchise tax against a foreign company which is not "carrying on" or "transacting business" in the state. Such statutes are quite usual, and have almost uniformly been construed as not applicable to the contracts of foreign companies which are not of a character to indicate a purpose to engage in business in the state. Statutes requiring foreign corporations to file their charters, or take out a license, or pay a franchise tax, have with much uniformity been construed as not rendering void contracts which constituted a solitary act of business not indicating a purpose to "carry on business" in the state. Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137; Manufacturing Co. v. Gorten, 93 Tenn. 590, 27 S. W. 971, 26 L. R. A. 135; Iron Works v. Cohen, 7 Colo. App. 341, 43 Pac. 667; Tabor v. Manufacturing Co., 11 Colo. 419, 18 Pac. 537; Dry Goods Co. v. Lester, 60 Ark. 120, 29 S. W. 34, 27 L. R. A. 505, 46 Am. St. Rep. 162; Bank v. Sherman, 28 Or. 573, 43 Pac. 658, 52 Am. St. Rep. 811.

The proper construction of the Michigan statute is that no foreign corporation shall begin any business in the state with the purpose of transacting or carrying it on until it shall have paid the franchise tax required by this law, and that, if it does so without complying with the law, all contracts made in the state in the conduct of that business shall be void. It is obvious, if this be a proper interpretation of the Michigan law, that the question as to whether the plaintiff corporation was a foreign corporation engaged in carrying on its business in Michigan without complying with the law was a question of fact to be determined by the jury under proper directions from the court, unless the facts bearing upon the question were undisputed, and the inference from them so obvious as to leave no issue for submission to the jury.

It was conceded that the plaintiff company was a corporation of Illinois, and that its shops for the making of certain lines of machinery were wholly in that state. It was also in evidence that it had no shops or place of business or office in the state of Michigan, and that business was solicited in that state through traveling agents or by correspond-

ence. But there was also evidence tending to show that the Wolf Company was engaged in the business of constructing and equipping manufacturing plants within the state of Michigan, which involved in some instances not only the equipment of such factories with machinery, but the actual planning and constructing of the factory buildings also.

The contract in question does not limit the contractors to machinery of any particular make or indicate its expected origin further than might be presumed from the domicile of the Wolf Company. As a matter of fact, very much of the machinery and equipment was bought from others, and a considerable part of such purchases were made in Michigan from Michigan manufacturers or dealers, though the larger proportion of the machinery installed was, in fact, made by the Wolf Company at their Chicago shops, and shipped in parts to the site and there set up. There was evidence that in the execution of their contract there were employed for several months from 25 to 100 men, who were employed and paid at Rochester, Mich., out of funds deposited in a bank at Rochester for this special purpose. If the business carried on in Michigan consisted wholly in the sale and delivery of goods to be brought into the state upon orders taken either in or out of the state, the Michigan act has no application, according to the construction put on the act by the supreme court of the state. Coit v. Sutton, heretofore cited. If, on the other hand, the business carried on in the state included something more than such interstate commerce, the act would apply, and it would be entirely competent for the state of Michigan to prescribe the payment of a franchise tax as a condition upon which such intrastate business might be carried on by a foreign corporation. Osborne v. Florida, 164 U. S. 650, 17 Sup. Ct. 214, 41 L. Ed. 586; New York v. Roberts, 171 U. S. 664, 19 Sup. Ct. 58, 43 L. Ed. 323.

In the light of all the evidence as to the character of the business involved in the contract here in question, as well as in other contracts made in Michigan before and immediately after the matter at issue, it will be the duty of the jury to say whether the Wolf Company was engaged in carrying on in Michigan any business which was intrastate in character. If they so find, then the Michigan act was applicable and the contract void, unless they find the required franchise tax had been paid prior to beginning such business. The inference to be drawn from the evidence is not, as a matter of law, so obvious as to justify the taking of the question from the jury.

2. Many errors have been assigned to the rulings of the court excluding evidence of alleged defects in the machinery and appliances furnished by the defendant in error, which defects were not discovered, and therefore not claimed, until after suit was brought. The court admitted evidence of defects not claimed before suit brought, when such defects were shown to have been latent, but excluded evidence of defects not then claimed when not accompanied by an offer to show that they were latent, although the plaintiff in error offered to show that such defects were not in fact discovered before suit.

After the factory had been completed and operated a whole season, and after its capacity to extract the sugar from 500 tons of beets per

day at a cost not exceeding 3¼ cents per pound for granulated sugar had been demonstrated and the warranty in that particular satisfied, the plaintiff in error, with great deliberation and in the most specific manner, pointed out in writing a large number of alleged minor defects or alleged departures from the highest standard of workmanship and machinery in the mechanism and appliances furnished, and declined to pay the balance of $28,000 then due, until these defects were remedied. Twice thereafter, and while the defendant in error was engaged in remedying certain of the matters complained of, this list of defects was amended and enlarged.

The claim that in one of the earlier communications specifying certain defects there was a general statement that there were others not mentioned, by reason of which an estoppel is obviated, has been considered. If that had been the last notice or negotiation, the contention would be of weight. But it was not. It was followed by a later communication, which amended the former list by the addition of nine other claims, making, with the former list, forty-five in all. These were all taken up and remedied until only four, or possibly five, remained unadjusted, and because the contractors would not remedy these remaining claims this suit became necessary. The defendant denied the averment that the contract had been performed, and gave notice that it would claim damages not only in respect of the four disputed items of which it had complained, but that it would claim many other defects not theretofore claimed, and upon the trial it offered to prove various other defects not claimed before suit, averring that these defects were unknown to the defendant until after suit brought.

This offer of evidence was unaccompanied by any offer to prove that these new claims were latent in character and undiscoverable by such inspection as the owner could give before suit. The contract provided that 15 per cent. of the total price might be withheld until 60 days after the starting of the factory. The demand for this balance was not made until after the factory had been operated through a whole season under the direction of the contractor and with its own skilled labor. From the beginning of the work and through the test operations the contractor was under obligation to give to the owner every reasonable opportunity for inspection, and no complaint is made that any obstacle to a full and complete inspection was interposed by the contractor. Neither is it contended that the purchaser would have waived the right to sue for a breach of the warranty by acceptance of the factory, or the right to set off the balance of purchase money when sued for same by the damages resulting from any breach of a warranty as to quality of machinery and workmanship. The objection made to the presentation of claims for defects which had not been presented before suit is predicated upon the fact that, when the balance due under the contract was demanded, the owner based the refusal to pay upon specified grounds, which did not include the objections now urged. The claim was that the contractor agreed that all materials, tools, appliances, machinery, and workmanship should be first class, and that all machinery and appliances should be of the latest and best pattern and design. This warranty it was claimed had been breached in the particulars pointed out, and the purchaser refused to

pay the balance of the purchase price until these specified defects were remedied. The question is whether, under such circumstances, the purchasers are not precluded from advancing new claims of defects without offering to show that these new claims were for latent defects not discoverable by any reasonable inspection at the time the original or amended lists of defects were presented. Under the circumstances, we have stated, we are of opinion that the learned trial judge did not err in excluding the evidence offered of defects not claimed when the purchaser particularized the matters in which it regarded the contract as not performed.

True, the plaintiff in error offered to show that these new claims for defects were in respect of defects not known to it before suit brought. But it did not offer to show that the defects were latent, and that there had been no negligence in failing to discover them when undertaking to point out the changes and alterations necessary to comply with the contract. The contention that it was for the contractor to show that these new claims were not founded upon latent defects is based upon an entire misapprehension of the ground upon which the ruling was rested. The purchaser undertook to point out specifically just what changes and alterations were necessary to satisfy the warranty as to the quality of workmanship, machinery, and appliances, and refused to make further payment until these things were done. The contractor, in effect, said: "Very well. There are four items in your list which I dispute. The remainder I concede. I will go forward and make the changes you demand except as to the items I dispute. These we will submit to the arbitrament of the courts. If I am right, you will pay me the entire balance I claim. If you are right, the sum awarded me will be diminished by the damages incident to the defects which you claim and I deny." The contractor did accordingly make all the changes and alterations demanded except in respect to four disputed items, and has submitted to the court the question as to whether he was bound to do the disputed things. Upon the items thus disputed the jury has found for the contractor.

To permit the purchaser under such circumstances to change the issues and propound new defenses, presumably waived, without offering to show that it had been misled by the conduct of the contractors or that the defects since discovered were latent, would be contrary to well-settled principles of estoppel. Littlejohn v. Shaw, 159 N. Y. 188, 53 N. E. 810; Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Carleton v. Jenks, 26 C. C. A. 265, 80 Fed. 937; Davis v. Wakelee, 156 U. S. 680–690, 15 Sup. Ct. 555, 39 L. Ed. 578; Gingrass v. Iron Cliffs Co., 48 Mich. 413, 12 N. W. 633; Gould v. Banks, 8 Wend. 562, 24 Am. Dec. 90; Manufacturing Co. v. Allen, 53 N. Y. 515, 519.

In Railway Co. v. McCarthy, cited above, Mr. Justice Swayne, speaking for the court, thus stated the principle upon which the ruling of the court below was predicated:

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law."

Gould v. Banks, 8 Wend. 562, 24 Am. Dec. 90; Holbrook v. Wight, 24 Wend. 169, 35 Am. Dec. 607; Everett v. Saltus, 15 Wend. 474; Wright v. Reed, 3 Term R. 554; Duffy v. O'Donovan, 46 N. Y. 223; Winter v. Coit, 7 N. Y. 288, 57 Am. Dec. 522.

In Carleton v. Jenks it was sought to hold a contractor liable for the damages sustained by a lake steamer by the moving of her boilers, alleged to be due to insecure fastenings. After the boilers had been put in place it was shown that the contractor had called upon the officers of the steamer to examine and inspect the work. This they did, and no fault was found, and the boiler was accepted.

Speaking for this court, Judge Severens said:

"After this inspection, made for the purpose of determining the question of their acceptance, and the taking the machinery away without any further requirements, we think the appellants were properly held to have been concluded from afterwards raising the question of the nonperformance of the contract. Beverly v. Coke Co., 6 Adol. & E. 829; Parker v. Palmer, 4 Barn. & Ald. 387; Bianchi v. Nash, 1 Mees. & W. 545; Norton v. Dreyfuss, 106 N. Y. 90, 12 N. E. 428; Iron Co. v. Pope, 108 N. Y. 232, 15 N. E. 335; Pierson v. Crooks, 115 N. Y. 539, 22 N. E. 349, 12 Am. St. Rep. 831; Studer v. Bleistein, 115 N. Y. 316, 22 N. E. 243, 5 L. R. A. 702; Hirshhorn v. Stewart, 49 Iowa, 418. The two cases in 115 N. Y. and 22 N. E. contain very full and elaborate discussions of the law on the subject. A suggestion is made in behalf of the appellants that the appellees were skilled in their work, and that for that reason they (the appellants) were entitled to rely upon representations made by the manufacturers, that the fastening was sufficient, and that, their acceptance being founded upon a representation which turned out to be untrue, the appellants are not bound by such acceptance. We are unable, however, to find much force in this suggestion. It might have significance if the question related to the construction of the boiler itself and applied to inherent defects, or those which were not as readily observable to the other party as to the manufacturers; but the matter of the fastenings to the boat was open, and as much exposed to the inspection and judgment of the appellants as to the manufacturers, and the requirements would seem to be as much within the knowledge of the manager, the captain of the boat, and more especially the chief engineer, who had immediate charge of the machinery, as to any one. In these circumstances the doctrine which the appellants invoke would not have application. Dounce v. Dow, 57 N. Y. 16; Gurney v. Railway Co., 58 N. Y. 359; Dounce v. Dow, 64 N. Y. 411; Benj. Sales, p. 701."

In Littlejohn v. Shaw, cited above, the action was upon a contract of sale of gambier. The defendant had rejected the article delivered upon two specific grounds. The contention was that it was a condition precedent to recovery that the plaintiff should affirmatively prove that all the terms of the contract had been fulfilled on his part, and that a failure in any point was fatal to the action. After observing that the general rule was that it devolved upon a plaintiff to show performance of all essential stipulations of a contract sued upon, the New York court of appeals said:

"But in this case the defendants placed their rejection of the gambier upon two specific grounds, viz., that it was not of good merchantable quality, and that it was not in good merchantable condition. By thus formally stating their objections, they must be held to have waived all other objections. The principle is plain, and needs no argument in support of it, that if a particular objection is taken to the performance, and the party is silent as to all others, they are deemed to be waived. This waiver of all other objections is not only justly inferable generally, but is especially so when as under the circumstances present in this case the deliberateness with which the objec-

tions are stated leaves it to be implied that there has been a consideration of the matter of acceptance of the goods and a result reached upon particular grounds. The defendants, therefore, were not in a position to insist upon any other proof of the plaintiffs, to enable them to recover upon their cause of action, than that the gambier was of good merchantable quality and in good merchantable condition."

The errors assigned upon the exclusion of evidence of defects not claimed before suit, and not accompanied by an offer to show that the defects were latent, and all exceptions to the charge as delivered and to the refusal of the court to deliver special charges bearing on this matter, are overruled.

There are a number of exceptions to the competency of evidence, for the most part not of material character, which we do not pass upon, as they are not likely to arise upon another trial, in view of the matter already decided.

The judgment, for the reasons already stated, will be remanded, with directions to award a new trial.