RAND et al. v. MORSE et al. *

(Circuit Court of Appeals, Eighth Circuit. May 7, 1923.)

No. 6187.

1. Sales ⬥83—Obligations of seller under, "c. i. f." contract stated.

The use in a contract of sale of the letters c. i. f. imposes on seller the duty of procuring at his cost and delivering to purchaser upon payment a bill of lading properly indorsed, and an insurance policy covering the risk of voyage, especially when the contract provides for payment on presentation of sight draft against steamship bill of lading or delivery order accompanied by other necessary documents.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied August, 3, 1923.

2. Sales ⬿161—Bill of lading passes title, and surrender amounts to constructive or symbolical delivery.

Under c. i. f. contract of sale, the bill of lading passes title and enables the buyer to get the goods, and, when turned over to him there is a constructive or symbolical delivery.

3. Insurance ⬿159—Each buyer in turn protected by insurance under c. i. f. contract.

Having paid for the goods and acquired title thereto and right of possession, each buyer under a c. i. f. contract in turn is protected against loss by the insurance policy obtained by the seller.

4. Sales ⬿161—Invoices not necessary documents under c. i. f. contract.

While the original shipper's invoice and one from the immediate seller are usually turned over under c. i. f. contracts, they are not accounted as necessary documents in performance.

.5. Sales ⬿182(3)—Question whether buyer waived objection, because only photographic copies of documents attached to bill of lading, properly submitted to jury.

Where there was substantial proof that buyer under c. i. f. contract knew only photographic copies of insurance policy and certificate of survey where attached to bill of lading, but during 10 days, during which draft and documents were held by bank pending controversy over payment of interest, no complaint or objection on that ground was made, the question of waiver was properly submitted to jury.

6. Sales ⬿176(1)—Obligations of seller and buyer held concurrent conditions, and subject to waiver.

Under c. i. f. contract of sale, seller's obligation to deliver necessary documents and buyer's to pay the contract price are concurrent conditions in nature of mutual conditions precedent, and either may waive performance in the exact requirements of the contract, expressly or by implication from acts and conduct.

7. Estoppel ⬿52—"Waiver" defined.

A "waiver" is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Waiver.]

8. Insurance ⬿160—Marine insurance policy held to protect buyer of part of shipment.

Where marine insurance policy insured the consignors in their own names and for and in the names of all other persons to whom the shipment might appertain in part or in all, buyer of part of the shipment was protected.

9. Sales ⬿181(11)—Facts held to show buyer's general manager knew only photographic copies of certain documents accompanied bill of lading.

Failure of buyer's general manager to examine documents accompanying draft under c. i. f. contract on several visits to bank holding it, and his offer to take up the draft without interest, held to show that he knew that only photographic copies of insurance policy and certificate of survey accompanied the draft, especially as notations on the invoice warranted finding that he knew what documents were with the draft.

10. Sales ⬿176(1)—Buyer held estopped to object to photographic copies of documents accompanying bill of lading.

Where buyer requested bank to hold draft without objecting to photographic copies of insurance policy and certificate of survey accompanying the draft, though, if objection had been made, a retroactive policy could have been taken out, and if payment had been refused, loss on falling market could have been avoided, and controversy arose over interest, which was settled by the seller's waiver of interest, the buyer was thereafter estopped to object to such photographic copies.

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**11. Sales ⬥179(1)—Buyer held bound, when draft and accompanying documents presented morning following its offer to take up draft.**

Buyer, under c. i. f. contract, of rice consigned to Havana, requested bank to hold draft, but refused to pay interest demanded by seller. It later offered to take up the draft at once without interest. The bank communicated with the seller, who waived interest, and the following morning presented the draft and accompanying documents. There was then ample time for the documents to have been sent to Havana before the steamer arrived. *Held*, that buyer was obligated to pay, and could not then announce that it had rescinded.

**12. Insurance ⬥160—Purchaser of part of shipment held protected against deduction from its part of amount deductible under particular average clause.**

Though marine insurance policy permitting particular average to the extent of 10 per cent. covered 4,464 bags of rice, where insurer separately bound itself to indemnify each and every person interested, a purchaser of 1,339 bags was sufficiently protected against loss by it of 446 bags under the particular average clause.

**13. Joint-stock companies and business trusts ⬥15(1)—Members of mercantile association held bound as partners by contract which general manager was permitted to make.**

Members of mercantile association, the property of which was held by trustees, *held* liable as partners on contract which its general manager was authorized to make by the articles of association, where the trustees were permitted to own shares without limit.

**14. Joint-stock companies and business trusts ⬥15(1)—Members of mercantile association held liable on contract similiar to those previously made, even though not authorized by articles of association.**

Members of mercantile association conducted by trustees were liable as partners on contract for purchase of rice, though not authorized by articles of association, where it was engaged in making deals of like character and had local agent at port of delivery, who had received and disposed of rice shipped there for it from the same foreign territory, and its general manager was an expert dealer in rice.

In Error to the District Court of the United States for the Eastern District of Missouri.

Action by C. S. Morse and others against Frank C. Rand and others. Judgment for plaintiffs, and defendants bring error. Affirmed.

John M. Goodwin, of St. Louis, Mo. (Otto F. Karbe and Jourdan, Rassieur & Pierce, all of St. Louis, Mo., on the brief), for plaintiffs in error.

Frank H. Sullivan, of St. Louis, Mo. (William O. Reeder and Jones, Hocker, Sullivan & Angert, all of St. Louis, Mo., on the brief), for defendants in error.

Before STONE, LEWIS, and KENYON, Circuit Judges.

LEWIS, Circuit Judge. In this action the seller of 150 tons of rice on a c. i. f. contract got judgment against the buyer for failure to pay the purchase price. National Rice Mills, a copartnership, of San Francisco, was the seller, and Mississippi Valley Trading & Navigation Company, an unincorporated association, of St. Louis, was the buyer. Its individual members were made defendants.

[1-3] The law raises a definite implication from the use of the three letters c. i. f. as to the duty of seller in executing the contract. They are used in this contract, and their use imposed on the seller the duty

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of procuring at his cost and delivering to the purchaser when he would pay for the rice shipped, a bill of lading properly endorsed and an insurance policy covering the risk of voyage. That duty is repeated in the contract in the clause which fixed the terms of payment, as "Net Cash, sight draft against documents, payable upon presentation, consisting of Steamship B/L or Delivery Order on Steamship Company, Seller's option, accompanied by other necessary documents." The purpose of each is evident. The bill of lading passes title and enables the buyer to get the goods at destination. When turned over to him there is a constructive or symbolical delivery by the seller. It is said to be in the nature of a title deed to the things sold, so that it may be passed on by endorsement to another buyer. Having paid for the goods and acquired title thereto and right to possession, the policy protects each buyer in turn against loss. Thames & Mersey Ins. Co. v. U. S., 237 U. S. 19; 35 Sup. Ct. 496, 59 L. Ed. 821, Ann. Cas. 1915D, 1087; Harper v. Hochstim (C. C. A.) 278 Fed. 102, 20 A. L. R. 1232; Sanders Bros. v. MacLean & Co. (1882) 11 Q. B. 327; Biddell Bros. v. E. Clemens Horst Co., [1911] 1 K. B. 214; Orient Co., Ltd. v. Brekke & Howlid [1913] 1 K. B. 531. In C. Sharpe & Co. v. Nosawa & Co., [1917] 2 K. B., 814, it is said that the meaning of the c. i. f. contract is reasonably plain and—

"that such a contract is performed by the vendor taking reasonable steps to deliver as soon as possible after shipment the shipping documents, including the bill of lading and policy of insurance company, and the buyer paying the price against the documents unless there is some other stipulation as to payment in the contract. But performance by the seller is by delivery of the documents which represent the goods, i. e. the bill of lading which is a constructive delivery. The delivery intended by the contract is a constructive delivery. The bill of lading is, in the words of Bowen, L. J., a great master of the common law, 'a key which in the hands of a rightful owner is intended to unlock the door of the warehouse floating or fixed, in which the goods may chance to be,' and is therefore a constructive delivery of the goods to the buyer, who from the time he receives the documents has control of the goods and can deal with them relying on their receipt, or, by virtue of the insurance their value, so that there can be no doubt in his mind that he has the control of existing goods or their value."

[4] The original shipper's invoice and one from the immediate seller are usually turned over, but they are not counted necessary documents in performance.

In this case the contract was made on April 12th. The rice had been shipped from Hong Kong about three weeks before that, destination Havana, Cuba, where it arrived on June 1st. The 150 tons were a part of a larger shipment of rice (500 tons) consigned by a Hong Kong dealer, all destined to Havana, all packed in 4,464 bags of 224 pounds each, and each bag marked with the initials of consignor and consignee (a San Francisco dealer in rice), the letters "S. F." and the word "Havana,"—all stamped across a triangle outlined on each bag. The consignor made invoice of the 1,339 bags apart from the others, which was viséed by the Cuban Consul resident at Hong Kong. The master of the ship issued to consignor bill of lading in triplicate for the 1,339 bags. The consignor procured a certificate of survey to be made by the Hong Kong Chamber of Com-

merce on the entire 4,464 bags, and took out marine insurance in one policy of $127,400 on the 4,464 bags. These documents after proper endorsement all went to the consignee, who in turn passed them on to another buyer of the 500 tons at San Francisco, and he in turn sold the 150 tons in controversy to defendants in error (plaintiffs below). When defendants in error bought they received two of the triplicate bills of lading on the 1,339 bags, properly endorsed, they received the original consular invoice and photo copy of the insurance policy on the 4,464 bags, and photo copy of the certificate of the chamber of commerce. They also received from their vendor, established and reputable dealers in rice at San Francisco, letters wherein they said they held the original policy of insurance for the account of whom it might concern, pending arrival of the cargo at destination, and that the proportionate interest of defendants in error in that policy on the 150 tons was $38,220. They also said that the third bill of lading would be turned over on arrival. The third bill of lading was supposed to follow, as is the practice, on a later ship for safety. With these documents in hand the defendants in error, as seller under the contract of April 12th, ·drew a draft on April 28th on the buyer, plaintiffs in error, doing business at St. Louis, attached to that draft the documents above noted, which they had received from their vendor, the letters of their vendor in re the insurance policy and in re the third bill of lading, and also attached their invoice for the 150 tons; and placed them all in the First National Bank of San Francisco for collection. On the same day they made out and mailed to the buyer at St. Louis their invoice on the sale of the 150 tons, noted thereon terms of payment according to the contract, and set out in detail a list of the documents which they had attached to the draft. This invoice reached the buyer at St. Louis through the mail on the morning of May 3d, and on the same morning the First National Bank of St. Louis received from the San Francisco bank the draft with documents attached for collection. The record shows that the St. Louis buyer received the invoice through the mail containing the notations above referred to before they were notified on May 3d by the St. Louis bank that it held the draft and documents for collection. On receiving that notice from the bank the general manager of the buyer requested the bank to hold the draft until he might be advised of the impending arrival of the ship at Havana. He was told that this could not be done without permission from its correspondent at San Francisco. The San Francisco bank was advised of the request of the general manager. A reply was received and communicated to the general manager that the request would be granted on condition that the buyer pay interest on the amount at 6 per cent while the draft was being held. He declined to pay interest. Several messages were exchanged between the banks over this controversy. Finally on the morning of May 12th the general manager went to the St. Louis bank and advised them that he wanted to take up the draft that day or not at all, and that he would not pay interest. He left with them at that time a letter in which he requested the bank to present the draft with documents attached covering 1,339 bags at his office immediately, say-

ing that the steamer is due to arrive in Havana and that the documents must go forward in to-day's mail. The bank thereupon wired its correspondent again at San Francisco. At 2 o'clock in the afternoon of that day the general manager returned to the bank and brought with him the assistant treasurer of the buyer, repeated his demand that the draft and documents be delivered to him on payment of the face amount and stated that he had brought the treasurer there to give the check. Considerable discussion was had with the employés and officers of the bank on both visits. The draft, documents and telegrams were at hand. The latter were read and discussed, but at no time did the manager take in hand or look at or examine the draft and documents attached. On this last visit the manager and treasurer were advised of the wire that had been sent in the forenoon, and that the bank could not act until a reply was received. A little before four o'clock in the afternoon a message came from the San Francisco bank to waive interest on the draft. The bank at once attempted to find the general manager, but there was no one at his office with authority to act in the matter and he could not be reached. Early the next morning (May 13th) the bank sent the draft and documents to the buyer's office, the general manager was there, the draft and documents were presented and payment without interest demanded, but the manager said it was too late, he had rescinded the contract. Thereupon this action was brought, and at the trial the material and controlling issue was, whether an original policy of insurance on the 1,339 bags only should have accompanied the draft, whether the photo copy of the policy on the entire 4,464 bags was a sufficient compliance on the part of the seller, and if not, whether the buyer had waived by its conduct a separate original policy on the 1,339 bags.

[5-7] The court submitted the question of waiver to the jury as the only ground on which the seller was entitled, if at all, to recover; and by its verdict it found there had been waiver, and assessed the damages for breach. We are not persuaded that the court erred in leaving the question to the jury on the principle which it announced in its instructions. The obligation of the seller to deliver the necessary documents, and that of the buyer to pay the contract price, are said to be concurrent conditions in the nature of mutual conditions precedent, and either may waive performance in the exact requirements of the contract, expressly or by the implication resulting from acts or conduct. The obligation of each was a condition in execution of the contract. 2 Benjamin on Sales (4th Am. Ed. by Corbin) § 858 et seq. In Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689, it is said:

"A party always has the option to waive a condition or stipulation made in his own favor."

A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. Bennecke v. Insurance Co., 105 U. S. 355, 26 L. Ed. 990; Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420; 27 R. C. L. 904; 40 Cyc. 252; 29 A. & E. Ency. of Law (2d Ed.) 1091.

[8] The notations on the invoice received by the buyer on the morning of May 3d, coupled with the conduct of its general manager from that time until the morning of May 13th, when he refused to pay the face of the draft, afforded substantial proof in support of the conclusion that he knew the photo copy of the policy on the entire 4,464 bags was the only document in that respect with the draft and was the only insurance that had been taken out against loss in shipment. There can be no doubt, we. think, of the protection of the buyer in that policy. The purchase price for the 1,339 bags was $34,492.64, and its proportionate part in the whole policy was $38,220. In that regard the insurer declared in the policy:

"Be it known that Messrs. Soares & Co. [consignors] as well in his or their own Name or Names, as for and in the Name or Names of all and every other Person or Persons to whom the same doth, may or shall appertain in part or in all, do make Insurance, and hereby cause himself or themselves or them, and every of them, to be Insured, Lost or not lost, at and from Hong Kong to Havana," etc.

[9-12] The court put the question of waiver to the jury on the ground that the buyer, during the ten days in which the draft and documents were held at St. Louis pending the controversy as to whether the buyer should pay interest or the seller lose it, made no other complaint or objection to payment and taking up the draft and documents with it, and instructed the jury that if the buyer knew that an original policy on the 1,339 bags only was not attached to the draft, but instead there was attached to it the photo copy on the whole shipment, then they might find there was a waiver; on the principle that one who sets up specific objections cannot resort to others when sued. Insurance Co. v. Burman, 141 Fed. 835, 73 C. C. A. 69; Sugar Mills Co. v. Fred W. Wolf Co., 118 Fed. 239, 55 C. C. A. 93; Goodman v. Purnell, 187 Fed. 90, 109 C. C. A. 408; Littlejohn v. Shaw, 159 N. Y. 188, 53 N. E. 810; Ginn v. Coal Co., 143 Mich. 84, 106 N. W. 867, 107 N. W. 904; Wall Grocery Co. v. Jobbers' Overall Co. (C. C. A.) 264 Fed. 71; Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. But plaintiffs in error argue that the buyer did not know that an insurance policy covering the 150 tons only was not attached to the draft for delivery, did not know that the policy, copy of which was with the draft, covered 500 tons, including the 150, that the buyer did not examine the documents with the draft, that it had a right to rely on the legal presumption that when it paid the draft an original policy only on the rice it bought would be delivered to it, hence there could be no waiver of its rights in that respect; furthermore, it is said a waiver of a condition in a contract, to be good, must be either on a new consideration or under circumstances which raise an estoppel, and that there is neither here. The same argument is made as to the certificate of the chamber of commerce, which the court put on the same ground, as a necessary document. The certificate is mentioned in the contract. Its purpose is specified, it was "to be final as to weights, condition and quality"; this was evidentiary and material to the buyer only after he got title and took actual possession, and in event dispute came up. The contract did not say it was a "necessary document" or that it should be delivered with them. And we are

cited to Rice v. Fidelity & Deposit Co., 103 Fed. 427, 43 C. C. A. 270; Insurance Co. v. Thomas, 82 Fed. 406, 27 C. C. A. 42, 47 L. R. A. 450; Bailey v. Bond, 77 Fed. 406, 23 C. C. A. 206; Electric Co. v. Edison Co. (C. C.) 64 Fed. 997, and Williston on Contracts, vol. 2, § 679 et seq. As to the facts, we think the failure of the general manager to examine the documents with the draft on the several visits which he made to the bank is wholly inconsistent with any doubt in his mind as to what the documents were, and his claim that he did not know what they were is in contradiction of his offer to take up the draft on May 12th without interest. As already said, the notations on the invoice fully sustain a finding that he knew what documents were with the draft. Furthermore, we think there were elements of estoppel: First, the District Judge remarked, when the question was under discussion, and we take the remark to be true, that by common understanding it is known that if objection had been made by the buyer to the photo copy of the policy an original policy on the 1,339 bags only could have been taken out by the seller at once, retroactive in protection of the buyer, Insurance Co. v. Folsom, 18 Wall. 237, 251, 21 L. Ed. 827; and secondly, the general manager requested that the draft be held until he could be advised of the impending arrival of the ship, which delayed the matter for ten days while the controversy about interest was on, and during that time, if refusal to pay had been made on May 3d, the seller would have been at liberty to resell the rice and thus recoup in part prospective losses on a falling market. Moreover, the controversy about the interest involved a substantial sum. Each was insistent. Each has assigned here reasons for its contention. On May 12th that controversy was compromised and settled. The seller waived the interest and surrendered its claim thereto on the buyer's promise to pay at once. We think the buyer was obligated to do so when the draft and documents were presented at its office on the morning of May 13th, and that it could not evade that obligation by then announcing that it had rescinded. The proof shows that the documents could have then been gotten to Havana by due course of mail many days before the steamer arrived. The contention that a general clause in the policy, which warranted rice free from particular average under 10%, would have permitted in event of partial loss a deduction of as much as 446 bags as not insured from the 1,339 bags, does not impress us. While the policy covered the 4,464 bags, nevertheless the insurer separately bound itself under its terms (supra) to each and every person interested or who might become interested in the shipment, to indemnify each of them against loss! Hagan v. Insurance Co., 186 U. S. 423, 22 Sup. Ct. 862, 46 L. Ed. 1229.

[13, 14] The buyer was organized under articles of association executed by its individual members wherein it is declared that the subscribers proposed to transfer and deliver to seven named persons as trustees under the designation of the Mississippi Valley Trading & Navigation Company property including cash to be used in the proposed business venture. The trustees were to hold the property and conduct the business of the association—their successors were to be

elected by the stockholders. The authorized capital was $5,000,000, divided into shares of the par value of $100 each. The home office of the association was fixed at St. Louis, with branch offices as might be desirable in different states of the Mississippi Valley, or in any part of the world. The trustees were authorized to engage in the business of exporting the products of the Mississippi Valley directly or upon commission, or as agents or otherwise, and to engage in general shipping and forwarding export business, to promote trade between the Mississippi Valley and every nation or part thereof, to hold the legal title to all property at any time belonging to the company, to control, manage and dispose of its property and control the conduct of its business and to make and repeal such by-laws as they deem necessary. The trustees were expressly empowered to make and carry out contracts of every kind. They were to elect annually from their number a president, vice-president, general counsel, treasurer, secretary and general manager, and those officers were to have the authority and duties usually incident to like officers in a corporation, and such duties as the trustees might designate. A trustee was expressly permitted to acquire, own and dispose of shares of stock in the trust to the same extent as if he were not a trustee. Certificates of shares, negotiable and transferable on surrender, were to be issued. The number of trustees (at first seven) were to be increased to twenty-one at the annual meeting of the stockholders in June, 1920. Each share entitled the holder to one vote. The shareholders could terminate the trust at any time. There is an exemption clause which provides that the trustees shall have no power to bind the shareholders personally and that all persons contracting with, or having claims against the association, shall look only to the funds and property of the trust, and that neither trustees, shareholders nor officers shall be personally liable. The plaintiffs in error are members of that association, some of them trustees and officers. Over objection the District Court held as a matter of law that they were liable personally as partners.

The association was organized as a mercantile body for the purpose of making profits, it was controlled by its members, and its trustees were permitted to own shares without limit and thus participate as such in the control and conduct of the affairs of the association. Its general manager who had charge of this transaction from its inception when the contract was made until failure of performance was also designated as its vice-president. Error is assigned because the court ruled as stated and refused to submit to the jury an instruction to the effect that inasmuch as this transaction was not one of export the defendants were not liable unless the jury found that they authorized the general manager to make the contract. But the articles of association, which bound plaintiffs in error, gave authority to make this contract. They were bound without that, for the record establishes that the association was engaged before the making of this contract in deals of like character. It had a local agent at Havana who had received and disposed of rice shipped there for the buyer from the same foreign territory from which this shipment came. The general manager was an expert dealer in rice. Before his employment with the

St. Louis association he had been in that business for several years, and for a part of the time resided at Havana while engaged in the rice business. On the undisputed facts, and aside from authority given in the articles, we have no doubt that the court ruled rightly when it held that all members were liable as partners. Winship v. Bank, 5 Pet. 529, 560, 8 L. Ed. 216; Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225; Ashley v. Dowling, 203 Mass. 311, 89 N. E. 434, 133 Am. St. Rep. 296; Davison v. Holden, 55 Conn. 103, 10 Atl. 515, 3 Am. St. Rep. 40; Wrightington on Unincorp. Ass'ns, § 14.

Other objections to action taken during the progress of the trial were saved, and error thereon is assigned here. We deem them without merit, not prejudicial to the rights of plaintiffs in error.

Affirmed.