## COWETA FERTILIZER CO. v. BROWN.

### (Circuit Court of Appeals, Sixth Circuit. June 16, 1908.)

### No. 1,784.

1. SALES—SALE OR BAILMENT—RESERVATION OF TITLE OR LIEN.

Complainant entered into a contract by which it agreed to furnish fertilizer to defendant to be paid for by him by a certain date at a stated price. The contract provided that the fertilizer should remain the property of complainant until sold by defendant, and that complainant should then become the owner of the proceeds, whether cash or notes, which should be held for its use and benefit until it should be fully paid. *Held*, that such contract was not one of bailment, but of sale with an attempt to retain a lien upon the property sold, and that complainant could maintain an action at law thereon if valid to recover the price when due.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 7–11.]

2. SAME—LEGALITY UNDER LAW OF TENNESSEE.

A contract for the sale of merchandise on credit for the purpose of resale in the ordinary course of business, providing that the title shall not pass until payment of the purchase price, is illegal and void in Tennessee as contrary to the public policy of the state, and a suit to enforce the title or lien so attempted to be retained, being based upon such void contract, cannot be maintained in either the state or federal courts in that state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 1336–1352.]

3. AGRICULTURE—FERTILIZERS—SALE IN VIOLATION OF STATUTE.

Under Laws Tenn. 1897, p. 297, c. 123, to regulate the sale of commercial fertilizers, which requires all such fertilizers before being sold or offered for sale, or shipped into the state for sale, to be submitted to the commissioner of agriculture for analysis, and to have on each package a stamp showing its chemical analysis, the place of manufacture, the name of the manufacturer, and a certificate of approval of the commissioner, a contract under which an outside manufacturer shipped such fertilizer to a dealer within the state for sale without complying in any way with such law is illegal and void, and no action can be maintained thereon.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This is a bill to have an accounting and to enforce a lien upon or trust in the proceeds of the sale of some hundreds of sacks of fertilizer. The bill shows that on June 27, 1901, the Coweta Fertilizer Company, a corporation of the state of Georgia, and having its factory and office within that state, entered into a written contract with the defendant, a citizen of the state of Tennessee, whereby it agreed "to furnish" to Brown, "for sale" by him, certain amounts and kinds of fertilizers specifically described and having the analysis set out, delivery to be made in car load lots at three points named, all within the state of Tennessee. The paragraphs of this contract more directly bearing on the question at issue read as follows:

"(c) That the customer may sell all fertilizers at such advance over the prices hereinbefore stipulated as he shall see fit, and the same shall constitute his entire compensation and commission hereunder. The customer agrees:

"(1) To receive during the continuance of this contract all said fertilizers for sale, and to take the same and pay therefor the said prices hereinbefore mentioned, and that any advance, over and above such price at which he may sell the same, shall constitute his entire compensation so far as the company is concerned. * * *

"(3) That, until sold or settled for by the customer, the fertilizers contracted for under this agreement shall remain the property of the company and when sold, all the proceeds of the sales of such fertilizers including cash, notes, open accounts and collections therefrom, whenever in possession of the customer, shall be kept separate and be held by the customer for the use and benefit of the company and subject to its order, and the same, together with any unsold fertilizers taken under this agreement, shall be the property of the company until the entire indebtedness of the customer arising under this agreement has been paid. * * *

"(6) That any failure on the part of the customer to fulfill his obligation arising under this agreement, shall cause the debt hereunder to become immediately due and payable to the company, and any report or occurrence unfavorable to his credit shall terminate this agreement at the option of the company. * * *

"(9) That all shipments shall be made under this agreement by or before December 1, 1901, and that the payment of all taken is guaranteed in full to the company at the prices stated, and settlements are to be made on or before December 1, 1901, by cash or negotiable notes (on the company's regular form without erasure) of the customer, maturing 1-3 Ea. Nov. 15, Dec. 1, 15, 1902, and payable at Greenville, Tenn., Bank of ———. If the customer pays before December 1, 1901, a discount will be allowed at the rate of 7 per cent. per annum, from date of payment to December 1, 1901.

"(10) That this agreement shall be signed in quadruplicate and be operative only after being approved in writing by the company's home office. It is further agreed by and between the parties hereto:

"(x) That the company shall have the right to enforce the collection of the notes of the customer, given it in settlement for said fertilizers, upon the maturity of same, notwithstanding there may be any outstanding and unpaid accounts or notes held by him for the sales of the said fertilizers made by him, or on hand unsold any of said fertilizers, and any renewals given of notes under this agreement, or other forbearance or indulgence of any kind extended to the customer, or to the maker or endorser of any notes given by the party purchasing from him the fertilizers agreed to be furnished herein, shall not affect its terms and stipulations.

"(y) That the company shall be at no costs, expenses, or charges whatever in the collection of notes and obligations of purchaser of said fertilizers delivered to or held for the company by the customer, but all the same shall be borne by the customer.

"(z) That the customer will pay over to the company all the cash proceeds of sales made for cash, when sold, and on or before the first day of December, 1901, will send to the company a complete list of his time sales, and endorse, if necessary, and surrender to the company all notes received

by him from the purchaser of said fertilizers, which notes are to be returned by the company to him, if no contrary reason arises, for the purpose only of collection and remittance to the company, and when so returned are to be receipted for, in trust, to the company."

The bill charges that the quantity and quality of fertilizers shown by an exhibit were received by the defendant, that all or nearly all were sold by him to his customers, and that proceeds aggregating $3,500, either in money or customer's notes, have been received by him, and are withheld by him, he having paid over or accounted for only $105, and that he is accountable for the remainder. It then shows that the defendant refuses to account for the said proceeds as provided by said contract made an exhibit to the bill, "but, under some pretended claim that the goods did not contain the ingredients called for by the statutes of Tennessee, refuses to recognize your orator's rights in the premises or to account to it. * * *" It then avers that this conduct amounts to a breach of trust, as he holds said proceeds, as well as any goods unsold, in a fiduciary capacity and as the trustee of complainant, that it is remediless in a court of law or otherwise than in a court of equity. The prayer is for an accounting for the goods sold and unsold and of the proceeds "whether in notes or cash"; that the complainant "be decreed to be entitled to, and to recover such of said goods on hand as may not have been sold and be decreed to be entitled to, and recover from said defendant all moneys collected by him, the proceeds of said goods, and all notes or choses in action received as the proceeds of such goods, where the same have not been paid for in money; and that by a proper decree of this court the title and possession of such notes and choses in action be vested in your orator, and the same be required to be delivered to it; that where the same cannot be so turned over and delivered, or if the court shall not decree that the same be so delivered, that orator have a decree against said defendant for the face value of the said choses in action."

In this view of the jurisdiction of a court of equity, we cannot deny relief, unless the contract to which the complainant appeals is illegal and unenforceable for some one or more of the grounds urged against it. We cannot, therefore, escape a decision touching the merits of the case, for it is well established that, when one cannot make out a case for relief without relying upon an illegal contract, he cannot recover.

The defendant demurred, first, because complainant's remedy, if any he had, was complete and adequate at law; second, because neither the description and analysis of the fertilizers sold nor the averments of the bill show that said fertilizer conformed in quality to the requirements of the law of Tennessee, but that the same constituted goods which could not be legally sold under the statutes in force within the state. The demurrer was overruled. The answer denies that the complainant has ever complied with the Tennessee statute prescribing terms upon which corporations of other states may do business within that state; denies that the fertilizer which he had received conformed to the Tennessee statute regulating the sale of fertilizers within the state; denies that he is indebted to the complainant in any sum, and says that he did business with complainant the previous year and had bought and sold a large quantity of fertilizers, mainly upon a credit; that before making collections he paid to complainant his full account; that subsequently the Supreme Court of Tennessee had decided that fertilizers which did not conform to the law regulating their sale were illegally sold and that no suit would lie to recover the sale price; that in consequence of this ruling he had not been able to collect much of the amount due him for sales so made in 1900, as well as for very little of that sold in 1901. The sums thus lost to him by the defective character of complainant's fertilizers he pleads as an offset to anything which the court might find was due from him.

Upon the final hearing the court below dismissed the bill without prejudice to a suit at law.

Alex. King, for appellant.
Dana Harmon, for appellee.

Before LURTON and RICHARDS, Circuit Judges, and KNAP-
PEN, District Judge.

LURTON, Circuit Judge (after stating the facts as above). 1. The
concession of learned counsel for both parties is that the contract
under which Brown received the goods of the Coweta Company was
one of sale, and not one of bailment. All of the rights and risks of
ownership pertained to the buyer. There was an attempt to retain
the title until the goods were paid for, but this, if valid under the
public policy of Tennessee (see Star Manufacturing Co. v. Nordeman
et al., 118 Tenn. 384, 100 S. W. 93), was only for the purpose of se-
curity. The goods were bought to be resold. When a sale occurred,
assuming the title effectually reserved, the title passed to the purchas-
er, and by agreement the proceeds, whether money or credits, stood
charged with a trust in behalf of the Coweta Company for any part
of the original price. No right to return goods unsold was reserved.
On December 1, 1901, Brown was obligated to pay or settle by cash
or bankable notes for goods sold or unsold, regardless of sale on credit
by him, good or bad. Every risk of loss by blameless accident rest-
ed upon Brown. We agree with the court below that under this con-
tract the liability of Brown was that of a purchaser, and that a plain
action of debt was a remedy open to the complainant upon his fail-
ure to pay for the goods received on or before December 1, 1901.
Arbuckle v. Kirkpatrick, 98 Tenn. 221, 39 S. W. 3, 36 L. R. A. 285,
60 Am. St. Rep. 854; Manufacturing Co. v. Nordeman, 118 Tenn.
384, 100 S. W. 93; Herryford v. Davis, 102 U. S. 235, 26 L. Ed. 160.

But appellants say that an action of debt at law is inadequate as a
remedy; that under the contract the title to unsold sacks of fertiliz-
er is in them, as are the proceeds of sales, whether in the shape of mon-
ey or notes, such proceeds being by the agreement substituted for the
goods so sold; that they are entitled to an accounting as to sold and un-
sold goods and as to proceeds of goods sold; that, so far as such pro-
ceeds of sales consist of notes or obligations of purchasers, it is en-
titled to have them turned over to it for purposes of collection, and to
have a decree appropriating such notes and all moneys in his hands
arising from such sales appropriated upon the debt so due; that
they are also entitled to have the unsold goods sold and proceeds
appropriated in the same way. The contract of sale and security by
retention of title, whether it operated to retain or pass the title, in view
of all the other circumstances and terms, is capable of being constru-
ed as an executory agreement manifesting an intention to constitute
unsold goods and the proceeds of goods sold a security for the un-
paid price of the goods. Such an agreement, when the property ap-
propriated to that purpose is designated in such a manner as to set it
apart from the other property or funds of the purchaser, creates an
equitable charge, lien, or mortgage which is enforceable against the
debtor, his administrator, and those who take with notice or who are
mere volunteers. 3 Pom. Eq. § 1,235; Walker v. Brown, 165 U. S.
654, 665, 17 Sup. Ct. 453, 41 L. Ed. 865; Bank v. Owens, 2 Pet. 527,
539, 7 L. Ed. 508; Miller v. Ammon, 145 U. S. 421, 426, 12 Sup. Ct.

884, 36 L. Ed. 759; Pullman's Palace Car Co. v. Central Transportation Co., 171 U. S. 138, 151, 18 Sup. Ct. 808, 43 L. Ed. 108; Singer Manufacturing Co. v. Looney, 103 Tenn. 262, 264, 265, 52 S. W. 879. In the Pullman Car Company Case, cited above, the Supreme Court said:

"* * * In no way and through no channels, directly or indirectly, will the courts allow an action to be maintained for the recovery of property delivered under an illegal contract where, in order to maintain such recovery, it is necessary to have recourse to that contract. The right of recovery must rest upon a disaffirmance of the contract, and it is permitted only because the desire of courts to do justice as far as possible to the party who has made payment or delivered property under a void agreement, and which in justice he ought to recover. But courts will not in such endeavor permit any recovery which will weaken the rule founded upon the principles of public policy already noticed."

This was a Tennessee contract. The seller agreed to deliver the goods to the buyer in Tennessee for the purpose of retail sales in that state. Contracts of sale of merchandise made on credit for purpose of resale in ordinary course of business, providing that the title shall not pass until payment of the purchase price, are in Tennessee illegal and void as contrary to the public policy of that state. Manufacturing Company v. Nordeman, 118 Tenn. 384, 100 S. W. 93. The case cited arose out of a contract for the sale of merchandise to a retail merchant for the purpose of reselling in the ordinary course of his business. The contract provided:

"As a condition to this contract, it is agreed that title to the goods does not pass until goods are paid for in full."

The purchaser became a bankrupt and the goods came to the possession of his trustee in bankruptcy, who sold them and held the proceeds. The suit was by the original vendor against the trustee to recover the value of the goods. The Tennessee court denied relief, although the title of the trustee was no better than that of the bankrupt. Among other things that court said:

"A conditional sale of personal property, as understood in this state, means one in which the title is retained by the vendor, with no right in the vendee to sell the property (Houston v. Dyche, Meigs, 76, 33 Am. Dec. 130; Price v. Jones, 3 Head, 84; Holmark v. Molin, 5 Cold. 482; Acts 1899, p. 19, c. 12, § 1; Shannon's Code Supp. p. 638), and in which the property is not subject to the debts of the vendee (Gambling v. Read, Meigs, 281; Bradshaw v. Thomas, 7 Yerg. 497). The foregoing characteristics of the sale do not preclude the idea, however, of a very distinct interest in the vendee. Meagher v. Hollenberg, 9 Lea, 392. The two characteristics above mentioned are inconsistent with a sale made to a retail merchant of goods to be resold by him in the ordinary course of his business. We are of the opinion, therefore, that the retention of title was nugatory, and that the goods belonged to the S. Steinberg Dry Goods Company, and properly passed into the hands of its trustee in bankruptcy. We are aware that a different view of this question is entertained in some of the states, but we believe the foregoing to be the sounder view and most in accord with public policy. It is certainly in line with our own previous decisions, and with the disinclination of this court to extend the law of conditional sales further than has already been done, since they are essentially out of harmony with the policy which underlies our registration laws."

Thus, under the public policy of Tennessee, the very provisions of the contract of sale upon which complainant relies are illegal and

void as contrary to the public policy of that state. If unenforceable through a state court in consequence of such a policy, their provisions are equally unenforceable through a federal court.

But upon a still stronger ground this contract was illegal under the laws of Tennessee. By chapter 123, p. 279, of the Acts of Tennessee for the year 1897, the sale of commercial fertilizers within the state is regulated. Sections 2, 3, 4, 10, and 11 read as follows:

"Sec. 2. Be it further enacted, that all commercial fertilizers sold or offered for sale in this state shall, by stamp or otherwise, distinctly set forth on each package or parcel the chemical analysis of such fertilizers, the name of the manufacturer, the place of manufacture, and each of said packages or parcels shall be freely submitted to inspection, as hereinafter provided, and shall bear a certificate of inspection, or tag furnished by the commissioner of agriculture, and showing authority from the state to sell such fertilizers.

"Sec. 3. Be it further enacted, that none of said fertilizers shall be sold in this state, unless their analysis shall show a given per cent. to be prescribed by the commissioner of agriculture.

"Sec. 4. Be it further enacted, that before selling or offering for sale any commercial fertilizer, its manufacturer, dealer or agent, shall file with the commissioner of agriculture a guaranteed analysis of each brand of commercial fertilizers, thus sold, or offered for sale, in this state. On all such fertilizers sold, or offered for sale, in this state, an inspection fee of fifty (50) cents per ton, or fraction of a ton, shall be paid to the commissioner of agriculture by the manufacturer, dealer or agent thereof. The sum accruing from said fees shall be applied first to the expenses of inspection, including an amount of not more than eight hundred ($800.00) dollars per annum for analysis, the balance to become a part of the general fund annually provided by the state for the maintenance of the bureau of agriculture. The said commissioner of agriculture shall keep a separate account for all fees received for the inspection of fertilizers, and the expenses of said inspection. * * *

"Sec. 10. Be it further enacted, that any person, or persons, firm or corporation selling or offering for sale any commercial fertilizers in this state, without having complied with the provisions of this act, shall be guilty of a misdemeanor, and, upon conviction, shall be fined two hundred ($200.00) dollars for each offense; and it shall be the duty of the commissioner or any inspector, to seize the fertilizers of said person or persons, firm or corporation thus failing to comply, and store the same at a point convenient to the place of seizure, and immediately give notice to its owner, or owners, or their agents, if known, of such action, and if such owner or owners, or their agents, fail or refuse to comply with this act within thirty (30) days after after said notification, the commissioner is empowered to sell or have sold said fertilizers, and to apply the proceeds first to the payment of the fees, fines and storage, and shall hold the residue, if any, subject to the order of the owner.

"Sec. 11. Be it further enacted, That all of said tags, purchased for the sale of said fertilizers, shall be attached to the package containing the fertilizer before the same enters the state. No railroad, express company, steamboat, or other common carrier, corporation or person shall deliver to the consignees any shipment or consignment of fertilizers, unless the same has attached to it the tags required by this act. Any railroad, express company, steamboat, or other common carrier, corporation or person, receiving any shipment or consignment of fertilizers to be delivered in this state, that has not these tags attached to it, shall at once notify the commissioner of agriculture of the reception of each shipment or consignment, and shall hold all such shipments or consignments until the requirements of the law have been complied with, and in the event said shipper or consignee shall fail or refuse to comply with said requirement of the law, their said shipment shall be returned to him at his expense. Any railroad, express company, steamboat, or other common carrier, corporation, or person violating

this section, shall be guilty of a misdemeanor, and, on conviction thereof, shall pay a fine of not less than $100.00, and not more than $500.00."

With the exception of a small part of the fertilizers sold, for which this suit is brought, which small part was specifically paid for by the payment of $105 confessed by the bill, none of the bills rendered showed a compliance with the law, and the evidence fully sustains the answer that this company had not complied with the requirements of the statute, either in respect to tags showing the analysis, or in fact as respects the ingredients demanded by the statute.

The other defense, that this company, as a foreign corporation, had not complied with the provisions of the Tennessee law requiring the registration of its charter as a prerequisite to doing business in this state, we pass by, as we are not satisfied that this corporation by this sale was doing business within the state within the meaning of the Tennessee statute. Considered only as a straight sale by a nonresident company to a merchant in Tennessee, the sale constituted an interstate transaction not subject to the statute referred to. Milan Milling Co. v. Gorten, 93 Tenn. 590, 27 S. W. 971, 26 L. R. A. 135; Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137; Oakland Sugar Mill Co. v. Wolf, 118 Fed. 239, 55 C. C. A. 93.

Remand, with direction to dismiss the bill with prejudice.