PARLETT et al. v. BLAKE.

(Circuit Court of Appeals, Eighth Circuit. May 18, 1911.)

No. 3,400.

BANKRUPTCY (§ 140*)—ASSETS—BAILMENT AND SALE.

Where certain agency contracts appointed the bankrupt agent for the sale of manufacturers' furniture and carpets for a period ending July 1, 1899, the contract providing that the bankrupt, on final termination of the agreement, agreed "to buy and pay for at the then current prices and on the regular terms, such goods as might be then on hand," the contract was not executory as to the goods remaining at the termination of the contract, but, as to such goods, constituted a sale, so that the title to the goods so remaining passed to the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 225; Dec. Dig. § 140.*]

Appeal from the District Court of the United States for the Western District of Missouri.

In Bankruptcy. Petition by George F. Parlett and another to recover possession of certain furniture against Daniel F. Blake, trustee in bankruptcy of Hallack-Deamer Carpet Company. From an order dismissing the petition, affirmed by the District Court, petitioners appeal. Affirmed.

On June 19, 1908, the Hallack-Deamer Carpet Company, the bankrupt, made a written contract with the Coppes, Zook & Mutschler Company of Nappannee, Ind., as follows: "This agreement entered into this 19th day of June, 1908, between the Coppes, Zook & Mutschler Co., of Nappannee, Indiana, party of the first part, and the Hallack-Deamer Carpet Co., of Kansas City, Missouri, party of the second part, witnesseth: That for the period of one year, ending July 1, 1909, said party of the second part hereby agrees to act as the agent of the party of the first part in effecting sales of furniture manufactured by said first party * * * to the furniture trade in the following territories, viz.: The state of Kansas and the western part of Missouri, after the following general manner, to wit: Said second party agrees to maintain a represent-ative line of samples of the furniture manufactured by the said first party on the floor in their store in Kansas City for use in soliciting trade from visiting buyers, also solicit trade from the furniture dealers in the aforesaid territory by means of their traveling salesmen, catalogs, and other usual means of advertising. Said second party further agrees that all sales made under this agreement shall be made at the prices as directed by the party of the first part. * * * Said party of the second part further agrees to make report daily to said first party of all sales effected on account of said first party,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

together with all terms and agreements relative to said sales. * * * It is further agreed that the said first party shall, for themselves, determine upon the orders to be by them accepted and the amount of credit to be extended, and in the event that sales have been made and goods delivered by said second party before said first party has expressed their approval of said sale, then it shall be at the option of said first party to charge said sale to the account of the Hallack-Deamer Carpet Co., at the regular terms and so notify them promptly.

"To the end that business may be expedited and goods promptly delivered to the trade in Kansas City and nearby points, the said party of the first part agrees to keep on hand, on consignment with the Hallack-Deamer Carpet Co., such goods as may be necessary to supply the needs of the business resulting under this agreement, and to replenish such stock from time to time upon the order of the party of the second part, and further to make their best endeavor to ship promptly such goods as are ordered to be shipped direct to the trade, or in mixed cars from Nappannee, Indiana.

"The party of the second part agrees to furnish suitable warehouses in which to store the aforesaid goods and to keep them insured against loss or damage, by fire or water, to the amount of 90 per cent. of their value, for and on account of the Coppes, Zook & Mutschler Co. Also to do all necessary labor in handling, caring for, packing, transferring and shipping said goods, and at the final termination of this agreement to buy and pay for at the then current prices and the regular terms such goods as may be then on hand. * * *

"It is further agreed that the regular terms of sale shall be sixty days net or two per cent. discount for cash within thirty days, and that in the event that goods are to be shipped to Chicago or other nearby points for loading in mixed cars, that the freight charges to such points shall be prepaid by the party of the first part. * * * In consideration of the aforesaid agreement and that the party of the second part shall at all times make their best endeavor to effect said sales, to reliable and responsible trade and to care for the delivery in a thoroughly satisfactory manner such goods as are carried by them on consignment under this agreement, the party of the first part agrees to pay, and the party of the second part agrees to receive in full payment for all services rendered, a commission fee of 10 per cent. of the gross amount of the sales accepted and shipped. Said commission to be due and payable on the 10th day of each month, upon all business transacted during the previous calendar month."

On July 3, 1908, the Carpet Company made a like contract with the Lincoln Upholstering Company of Lincoln, Nebraska, for a like period ending July 1, 1909. These contracts were not acknowledged or recorded. Under them the Zook Company and the Lincoln Company each shipped goods to the Carpet Company. Tags were attached to these goods indicating from whom they were shipped. Separate accounts were kept showing the sales made from them respectively. After May, 1909, the business of the Carpet Company became dull and remittances to the consignors became irregular but business went on as before and continued with no material change until August 3, 1909, when a representative of the Coppes, Zook Company went to Kansas City, examined into the condition of things and determined to remove the goods then on hand consigned by his company from the Carpet Company's store; was about to do so when Mr. Deamer, the president of the Carpet Company, suggested that it would hurt his business if a large amount of goods should be removed and asked if some arrangement could not be made by which the goods could be left in the store. It was finally determined that they should be turned over to Mr. George F. Parlett, who was then an employé of the Carpet Company, to be disposed of for account of the Coppes, Zook Company. A similar arrangement was made by the Lincoln Upholstering Company with respect to goods shipped by it to the Carpet Company then on hand.

Petition was filed on August 30, 1909, in the court below by the creditors of the Carpet Company seeking its adjudication in bankruptcy. The adjudication followed on October 7, 1909. Later Parlett (and his wife who seems to have become jointly interested with him in his project) filed an intervening petition claiming as against the trustee of the Carpet Company in bankruptcy

the ownership and possession of the goods turned over to them by the two consignor companies. Their claim was denied by the court below and the case is brought here by appeal.

Otto Basye (Chas. W. Webster, on the brief), for appellants.

Albert R. Strother, for appellee.

Before SANBORN and ADAMS, Circuit Judges, and WM. H. MUNGER, District Judge.

ADAMS, Circuit Judge (after stating the facts as above). In the view we take of this case it is unimportant to dwell upon the arrangement between George F. Parlett and his wife, Anna B. Parlett, interveners here, and the two consignor companies. Suffice it to say the evidence shows that the Carpet Company was at the time of the transfer insolvent, and that the Parletts paid no consideration to that company for the goods transferred to them. If, therefore, the goods belonged to the Carpet Company the transfer was without consideration and in fraud of the rights of its creditors. If they belonged to the consignors the transferees stand in their shoes and acquired their rights of property only.

The question then is whether the title to the goods on hand at the end of the contract period, July 1, 1909, passed to the Carpet Company or remained in the consignors. If the latter be the case, the trustee in bankruptcy had no concern with them. If the former, he is their owner, and the interveners were properly nonsuited.

The contracts in question were primarily contracts of agency for the sale of the consignors' goods for a period ending July 1, 1909. Goods were to be intrusted to the agent by them for sale and any that were actually sold prior to that time were the goods of the principals, and the proceeds less the commission reserved belonged to them and had to be accounted for. Whether this relation of agency ceased on July 1, 1909, depends upon the true interpretation of this clause of the contract:

"The party of the second part [the agent] agrees * * * at the final termination of this agreement to buy and pay for at the then current prices and the regular terms such goods as may be then on hand."

In Sturm v. Boker, 150 U. S. 312, 329, 14 Sup. Ct. 99 (37 L. Ed. 1043), it is said:

"The recognized distinction between bailment and sale is that when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed; the transaction is a sale."

In Re Columbus Buggy Co., 74 C. C. A. 611, 143 Fed. 859, 861, this court said:

"The power to require the restoration of the subject of the agreement is an indelible incident of a contract of bailment."

The contracts before us, disclosing no obligation or right in the agent to return the undisposed of goods to the consignors but the contrary and inconsistent obligation "to buy and pay for them," are,

therefore, in our opinion, not contracts of bailment. They stand on a different footing from the goods received and sold before the expiration of the contract period. These undoubtedly were bailments, and it is equally clear, we think, that the goods remaining undisposed of on July 1st, became by virtue of the provisions of the contracts, the property of the erstwhile bailees.

It is suggested that the clause of the contracts under consideration is executory, imposing an obligation to do something in the future rather than constituting a conclusive and final sale of such goods as might remain undisposed of at the end of the contract period.

If the clause had read:

"The party of the second part" (the agent) "agrees * * * at the final termination of this agreement to pay for" (instead of "to buy and pay for") "* * * such goods as may be then on hand"—

we think it could not be successfully claimed that the obligation to keep and pay for the goods was executory. A written obligation to "buy and pay for" goods in one's possession at a given fixed time does not seem essentially different from an obligation "to pay for" them at that time; and when we are striving to ascertain the intention of practical men in the language employed in a business contract, it is difficult to imagine that such minds would regard the two obligations thus expressed as at all different. Let us suppose the goods had been destroyed by fire while in the possession of the agent charged as it was with the obligation "to buy and pay for them"; can it be doubted that the consignors could have recovered from the agent the price which it had agreed to pay for them? We think not.

The contracts in their main and substantial aspect were, as already stated, agency contracts for a year's period. The object obviously was to dispose of as much merchandise as possible during that period. What would promote that object more than an obligation imposed upon the agent to keep and pay for such goods as it did not sell? It was, we think, in this natural and serviceable sense that the words of the contract in question creating the obligation "to buy and pay for" were employed. By requiring the agent to keep and pay for such goods as it did not sell to the trade during the year the business would naturally be promoted and the agency could be at once automatically and effectually wound up at the end of the year. This, in our opinion, was the clear intent and meaning of the parties in using the words "to buy and pay for," and under well-recognized rules of construction we should recognize and enforce it if possible. Moreover, there does not appear to have been any scope for the operation of an executory promise to buy.

Before the end of the year goods had been delivered to the Carpet Company for two purposes; some to be sold to the trade for account of the consignors, and the remainder to be paid for by the Carpet Company at current prices. Those that remained undisposed of at the end of the year were the subject of ready identification and thereby became the definite and certain subject of sale. The consignors had nothing to do but accept the purchase price. They had no option to take the goods or legal right to get them. The Carpet Company had

no legal right to return them. Its right as well as its obligation was to pay for them and that was all.

In view of these facts, we fail to discover any occasion or opportunity for further bargaining. The contracts as originally made operated proprio vigore upon a subject of sale which was to become and had become definite and certain.

It is said in Mechem on Sales, vol. 1, § 2:

"There may be an agreement whose legal effect is that the title shall not pass until a future time, either because, in the case of an ascertained chattel, something remains to happen or be performed which the parties have treated as precedent, or because the particular chattel whose title is to be so transferred has not yet been ascertained. This is an agreement to sell, called often, for purposes of further distinction, 'an executory sale.' It does not become a sale until the precedent event has happened or the condition has been performed. It then becomes a sale by force of the present agreement aided or completed by the happening of that event or the performance of that condition."

This is our view of the present case. The original contracts, on July 1, 1909, operated upon the undisposed of goods, and by force of their provisions transferred the title at once and unconditionally to the Carpet Company, on the terms specified. This, we think, expresses the intention of the contracting parties as manifested by the whole instruments, the objects to be accomplished and the conduct of the parties.

Counsel for intervenors invoke the doctrine of the following cases in support of their claim to the property in question: In re Galt, 56 C. C. A. 470, 120 Fed. 64, John Deere Plow Co. v. McDavid, 70 C. C. A. 422, 137 Fed. 802, In re Columbus Buggy Company, 74 C. C. A. 611, 143 Fed. 859, and In re Pierce, 85 C. C. A. 14, 157 Fed. 757, and other like cases, but we fail to see how that doctrine has any application to this case. Those cases decided that the contracts involved in them when properly construed were contracts of bailment or agency as distinguished from conditional sales, and as a result that the consignor's title to property which had been delivered to the bailee or agent was good as against the trustee in bankruptcy of the estate of the agent. This case on the contrary concerns property held by the Carpet Company with no option or right to return to the consignor and, therefore, not as a bailee or agent but with a duty and obligation to take and pay for it and, therefore, as the owner.

A patient investigation of authorities fails to disclose any adjudication upon the exact facts disclosed in this case. But we think the principles announced in the following cases dealing with very similar state of facts as those now before us lead unerringly to the conclusion we have reached. Conable v. Lynch, 45 Iowa, 84; Norton v. Fisher, 113 Iowa, 595;[1] Fish v. Benedict, 74 N. Y. 613; Ætna Powder Co. v. Hildebrand, 137 Ind. 462, 37 N. E. 136, 45 Am. St. Rep. 194; Arbuckle v. Gates & Brown, 95 Va. 802, 30 S. E. 496; Mack v. Drummond Tobacco Co., 48 Neb. 397, 67 N. W. 174, 58 Am. St. Rep. 691; O'Neal v. Stone, 79 Mo. App. 279; Potter v. Mt. Vernon Roller Mill Co., 101 Mo. App. 581, 73 S. W. 1005.

The court below rightly held that the interveners were not entitled to the relief sought, and its decree is affirmed.

[1] 85 N. W. 801.