In re EICHENGREEN et al.

RELIANCE SHOE CO. v. MANLY et al.

(District Court, D. Maryland.    February 25, 1927.)

1. Bankruptcy ⊂⇒140(1⅜)—Contract under which merchandise was shipped to bankrupt held one of sale, and not of bailment.

A contract under which merchandise was shipped by the manufacturer to bankrupt, which purported to be one of consignment for sale, and was by some of its terms, but by others a contract of sale, and which, inter alia, obligated bankrupt to pay for all goods remaining unsold three months after date of shipment, and to make good any loss on goods returned without cause or repossessed on termination of the contract or in case of insolvency or bankruptcy, construed in its entirety, held one of sale and not of bailment.

2. Bankruptcy ⊂⇒140(3)—Merchandise in possession of bankrupt as agent, not filing certificate required by statute, disclosing real owner of business, held to pass to its trustee (Code Pub. Gen. Laws Md. 1924, art. 2, §§ 18-20; Bankruptcy Act, § 70a [5], being U. S. Comp. St. § 9654).

Code Pub. Gen. Laws Md. 1924, art. 2, §§ 18-20, provide that any person engaged in mercantile business as agent, or in a name other than his own, shall file a certificate disclosing the name of his principal, or the real owner of the business; otherwise, any merchandise used or possessed therein shall be subject to claims of creditors of the business. Held that, under Bankruptcy Act, § 70a (5), being U. S. Comp. St. § 9654, in the bankruptcy of a firm so doing business as agent or consignee without having filed the required certificate, the merchandise so held passed to its trustee, as property which could have been levied on under a judgment against it.

In Bankruptcy. In the matter of Irving W. Eichengreen and Sigmund M. Adler, trading as Eichengreen & Co. and the Bristol Shoe Stores Company, bankrupts. On intervening petition of the Reliance Shoe Company for reclamation of property from George W. Manly, Eugene L. Miles, and Louis Binder, receivers. Petition dismissed.

In the matter of Irving W. Eichengreen and Sigmund M. Adler, trading as Eichengreen & Co. and the Bristol Shoe Stores Company, in bankruptcy. Intervening petition of the Reliance Shoe Company for an order directing the receivers to return to the intervening petitioner certain merchandise in their possession delivered to the bankrupt in accordance with its offer of March 3, 1926, duly accepted by the intervening petitioner, and the supplemental agreement of March 22, 1926, between the parties, hereinafter set forth:

"Baltimore, Maryland, March 3, 1926.

"Reliance Shoe Company, Beverly, Mass. —Gentlemen: We agree to act as your consignees, factors, or agents for the sale of your merchandise at our place of business in the city of Baltimore, on the following terms and conditions, namely:

"You will ship to us from time to time, as specified in our orders, merchandise produced by you of the kind, quantity, and style as ordered, which merchandise shall reasonably conform to the sample shown and shall be of the sizes as ordered.

"We reserve the right to cancel any merchandise ordered and not shipped within five working days from completion delivery date. We further reserve the right to return any shoes that do not reasonably conform to the

sample or are not the same sizes ordered. This reservation, however, must be exercised within five days from date of receipt of goods, and, if it is not so exercised, it shall be deemed that we have accepted the merchandise.

"No title or right therein shall be vested in us. We are to sell the merchandise in the usual and ordinary course of business. For so selling the merchandise we are to receive as compensation the amount by which the price received for the merchandise exceeds those prices set forth in your invoices of said merchandise. All black shoes and tan calf shoes shall be invoiced us at $3.10 per pair; all colored kid shall be invoiced us at $3.35 per pair, or at such prices as may hereafter be agreed upon. As an additional compensation we may deduct from the invoice price 7 per cent.

"On the first business day of each week we shall account to you for all merchandise sold during the preceding week, and shall forward you all money collected and received from the sale of goods during the previous week. A correct stock list of your merchandise in our hands, and the sales shall at all times be kept by us, and on the first business day of each week a true and accurate copy shall be mailed you.

"If we return to you any merchandise for any cause whatsoever other than factory damaged, you may sell the same at private sale without notice to us, and if at such sale the merchandise brings a less price than that which it was originally consigned to us at or invoiced, we agree that we will pay to you the difference between what the merchandise was sold for at such sale or sales by you and that price which it was originally consigned at or invoiced us.

"We agree that, by the act of selling to any person, firm, or corporation, we guarantee the account so sold, and guarantee the credit and reliability of the person, firm, or corporation so sold. We agree that, where merchandise is sold and we are unable to collect for the same, we will pay you for such merchandise, within 75 days from the date of the said sale, the value of the merchandise so sold, which value shall be the price or prices at which the same was consigned or invoiced the consignees, less 7 per cent. All accounts shall be deemed uncollectible unless they are paid for within 75 days from the date of sale, and on the seventy-fifth day from the date of sale we will forward you payment for the merchandise as set forth above. If we should within that period re-

ceive partial payment, we will forward that to you the first business day of the following week, or, if we receive payment in full, we will forward that likewise. No merchandise shall be removed from our place of business in Baltimore, nor sold, except in the usual and ordinary course of business. We shall keep all merchandise delivered us by you insured to its full value in your name and for your benefit without cost to you. This insurance shall cover fire, theft, and water damage. In the event of any loss through fire, theft, or water, or other unavoidable casualty, the proceeds shall be paid over to you up to the invoice value of said merchandise, less seven per cent. (7%).

"All merchandise shall be shipped f. o. b. factory, and we will keep the same free from any and all damage and spoliation. You are to have the right at reasonable times to enter our place of business for the purpose of examining said merchandise and verifying our accounts.

"This agreement may be terminated by giving a notice to that effect 30 days before the date fixed for the termination. Upon the giving of said notice by either of us, all the merchandise ordered by us from you up to that time, shall, at your election, be shipped us and we agree to accept the same on the same terms as heretofore set forth.

"There shall be a liquidating period of three months after such notice, during which time we shall sell your merchandise in the usual course of business and continue to send the weekly remittances and accounts as set forth above. At the end of the three months period, you shall have the right to enter in and upon our premises or wherever the goods not sold may be located and repossess yourself of the same without being guilty of trespass or violation of any of the conditions hereof, and you have the right to sell all merchandise taken by you to any person, firm, or corporation, and we agree, in the event the merchandise is sold for less than it was billed or invoiced us, to pay to you your loss or the difference between the price received at such sale and the price at which the merchandise was originally billed or invoiced us, less seven per cent. (7%).

"In the event that we make an assignment for the benefit of our creditors, or any officers are appointed by any court or tribunal to settle or compromise with our creditors, or we file a voluntary petition in bankruptcy, or an involuntary petition is filed by creditors against us, then this consignment is at an end, and you may thereupon enter into our premises, or wherever your goods may

be yet unsold, and repossess yourself of the same without being deemed guilty of any wrong. In the event that you sell the goods thereafter to any person, firm, or corporation for less than they were billed to us, we agree to pay you the difference between what they were sold for and what they were billed us, and it is understood that you may prove such claims in any assignment or any legal proceedings taken for the administration of the affairs or assets of ourselves.

"We agree that we will not claim any right, title, or interest in the merchandise shipped us, or interfere with or prevent you from recovering your goods when you so desire to do.

"We further agree that, if the payment of any invoice shall be postponed more than 30 days from the date of shipment, that part of our compensation or commission stipulated as seven per cent. (7%) shall be reduced at the rate of one-half of one per cent. per month until paid.

"We further agree that we will pay you in any event for all merchandise ordered and received by us and remaining unsold three months from the date of shipment.

"Any and all goods forwarded us by you after February 18, 1926, are to be deemed as shipped in accordance with and under the terms and conditions of this offer.

"Very truly yours,

"Eichengreen & Co.

"It is agreed between the Reliance Shoe Company, of Beverly, Massachusetts, and Eichengreen & Co., of Baltimore, Maryland, that the contract or agreement between said parties with respect to merchandise, dated March 3, 1926, and consummated by acceptance March 12, 1926, shall not be recorded in the record office of Baltimore City, unless and until Eichengreen & Co. shall become insolvent, make an assignment, or go into voluntary or involuntary bankruptcy, and in consideration of the injury to the credit of the said Eichengreen & Co. that shall be sustained by the premature recording of said contract, the Reliance Shoe Company hereby agrees and promises to pay, on demand, unto Eichengreen & Co. the sum of five thousand dollars ($5,000.00), as liquidated damages should they record said contract, or cause the same to be recorded contrary to this agreement.

"Dated at Baltimore, Maryland, the 22d day of March, 1926.

"Reliance Shoe Company,

"J. J. Lippitt, President."

Bartlett, Poe & Claggett, of Baltimore, Md., for Reliance Shoe Co.

Baldwin & Sappington and Louis W. Hollander, all of Baltimore, Md., for receivers.

SOPER, District Judge (after stating the facts as above). [1] Irving W. Eichengreen and Sigmund M. Adler, as individuals and as copartners trading as Eichengreen & Co., were adjudicated bankrupts on July 17, 1926, and receivers were appointed to take charge of their assets. The copartners (hereinafter called the dealers) had been engaged in the wholesale and retail shoe business, with stores in Baltimore, Md., and York, Pa. On July 23, 1926, the Reliance Shoe Company (hereinafter called the manufacturer) filed a petition in the bankruptcy case praying for an order directing the receivers to deliver to it 3,639 pairs of shoes, of the invoice value of approximately $12,130, found in the bankrupts' stores. This merchandise was delivered by the manufacturer to the dealers under the terms of an agreement of March 3, 1926, between the parties, which the manufacturer contends was a contract of consignment for sale. The receivers admit the execution of the agreement in connection with a supplemental agreement of March 22, 1926, whereby it was provided that the contract should not be recorded unless the dealers should become insolvent. The receivers, however, contend that these instruments did not constitute a contract of consignment, but a contract of sale, which, in order to secure the payment of the purchase money, was intended to be either a conditional sale, with reservation of title by the vendor, or an absolute sale with a vendor's lien on the property.

If it be a sale, it is not necessary to determine whether it is conditional or absolute since the contract was not recorded as provided by article 21, § 55, of the Annotated Code of Maryland. The statute declares that every contract for the sale of goods and chattels, wherein the title thereof, or a lien thereon, is reserved until the same be paid in whole or in part, and possession is to be delivered to the vendee, shall, in respect to such reservation, be void as to third persons without notice until such contract be recorded. The Court of Appeals of Maryland in Roberts & Co. v. Robinson, 141 Md. 41, 118 A. 198, has decided that a trustee in bankruptcy may oppose the reservation of a title in such an unrecorded contract on behalf of creditors without notice.

The question for consideration, therefore, is whether the contract is one of sale or of consignment for sale. The provisions of the contract are not entirely consistent with either theory. As tending to show that it is a contract of consignment, it is noteworthy that it expressly declares that the dealers shall act as "consignees, factors, or agents for the sale" of merchandise, and that no right, title, or interest in the goods shall be vested in them. They agree to keep and forward weekly to the manufacturer a correct list of the merchandise on hand and sales, and to account weekly for all merchandise sold. They agree neither to remove nor to sell any merchandise from their stores, except in the usual and ordinary course of business, and to insure all merchandise to its full value in the manufacturer's name, and in the event of loss, to pay to the manufacturer the proceeds of insurance up to the invoice value of the merchandise, less 7 per cent. They further agree that the manufacturer shall have the right at reasonable times to enter their stores for the purpose of examining merchandise and verifying accounts, and to repossess unsold goods in case of the termination of the agreement, or of the bankruptcy of the dealers. Finally they agree not to interfere with or prevent the manufacturer from recovering the goods when it so desires to do.

On the other hand, the manufacturer agrees to ship merchandise as ordered by the dealers, who have the right to return any shoes not ordered, and to cancel any order not shipped within 5 days. The compensation of the dealers is the amount by which the proceeds of their sales exceed the invoice price, less 7 per cent. If the dealers return any merchandise without cause, the manufacturer may sell it at private sale, without notice, and charge the dealers with the difference between the proceeds of sale and the invoice price. The dealers guarantee the payment of all goods sold by them on credit, and agree to pay all uncollected accounts within 75 days from the date of sale. Upon the termination of the agreement, the dealers agree at the option of the manufacturer to accept all merchandise previously ordered but not shipped. A liquidating period of 3 months after notice of termination is provided during which the dealers may sell the merchandise already ordered or on hand in the usual course of business and make weekly remittances and accounts, and at the end of the period the manufacturer has the right to repossess and sell the unsold merchandise, and, if sold for less than the invoice price

less 7 per cent., the dealers agree to make up the difference. There is a similar provision of repossession and sale in case of bankruptcy. Moreover, the dealers agree that they will pay the manufacturer in any event for all merchandise ordered and received by them and remaining unsold 3 months from the date of shipment. While the terminology of some of the provisions last mentioned is not usually found in agreements of sale, yet practically the burdens imposed and the benefits conferred thereby upon the parties resemble very closely the rights and obligations of vendor and vendee. Bearing in mind that the terms of the instrument do not fully support either contention, it is necessary to ascertain and give effect to the dominant thought, regardless of formal statement, for the true nature of the transaction depends less on the terms in which it is described than upon the rights and liabilities which it creates.

The characteristic of a bailment, which differentiates it from a sale, is that a bailment contemplates no transfer of ownership to the bailee. When the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he ordinarily becomes a debtor to make the return, the title to the property is changed, and the transaction is a sale. Williston on Sales, § 92; Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093. "An agreed price, a vendor, a vendee, an agreement of the former to sell for the agreed price, and an agreement of the latter to buy for and to pay the agreed price are essential elements of a contract of sale. * * * The power to require the restoration of the subject of the agreement is an indelible incident of a contract of bailment." In re Columbus Buggy Co. (C. C. A.) 143 F. 859. "The test would seem to be: Has the sender the right to compel a return of the thing sent, or has the receiver the option to pay for the thing in money?" In re Galt (C. C. A.) 120 F. 64, 68.

However, it should be borne in mind, as indicated in Sturm v. Boker and In re Galt, supra, that the ordinary or common-law liabilities of a bailee may be enlarged, without destroying the essential character of the contract. Consequently too much emphasis should not be put on certain of the provisions suggested above as indicating a sale rather than a consignment. Thus the fact that the contract provides that the receiver

of the goods may fix the selling price and may retain the difference between it and a price fixed by agreement to recompense him for insurance, storage, expenses and commissions,¹ does not constitute the contract an agreement of sale. It still lacks the obligation of the receiver to pay the purchase price for the goods and the obligation of the furnisher to transfer the title to him for that price. Columbus Buggy Company, supra; Franklin v. Stoughton Wagon Co. (C. C. A.) 168 F. 857; Ludvigh v. Am. Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345. Nor does the guaranty on the part of the dealer of all bills and accounts of purchasers transform the agreement from one of consignment to one of sale. Ludvigh v. Am. Woolen Co., supra.

Most significant, perhaps, in this connection, are decisions to the effect that an agreement on the part of the dealer to purchase goods, either at his own option, or at the option of the manufacturer, upon a certain contingency, does not necessarily create an agreement of sale. A valid contract of consignment may provide for a change of relationship during the course of the transaction; but, until the contingency happens, the agreement remains one of consignment. In the case of Mitchell Wagon Co. v. Poole (C. C. A.) 235 F. 817, the contract provided for the dealer becoming the purchaser in several contingencies, to wit: (1) When he sold the merchandise; (2) at any time within 12 months from the date of shipment, at his option, by paying an agreed price; (3) at the expiration of the selling period; and (4) in case the dealer sold out or closed his business. In the two last-mentioned contingencies, the consignee agreed at the consignor's option to purchase all the unsold merchandise. The court held that, under the circumstances of that case, the relationship between the parties was that of bailor and bailee until one of these events took place, since otherwise there was no agreement of the consignee to pay for the merchandise. The decision was rested mainly upon the right given in the agreement to the consignor to require a restoration of the merchandise, and upon the absence of an unqualified promise of the consignee to pay the purchase price for the thing alleged to be sold. It was suggested that, if the receiver of goods obligates himself to pay a fixed price at a fixed time, and there is no right on the part of the sender to a return of the goods, the contract is one of sale and not a bailment. See Coweta Fertilizer Co. v. Brown (C. C. A.) 163 F. 162.

Does the sender's right of recovery or the receiver's right of purchase prevail in the case at bar? The manufacturer emphasizes the provision of the contract wherein the dealers say: "We agree that we will not claim any right, title, or interest in the merchandise shipped us, or interfere with or prevent you from recovering your goods when you so desire to do." This clause purports to confer the right of recovery upon the shipper under all circumstances; but, of course, it must be read in connection with other terms of the contract. Elsewhere the manufacturer obligates itself to ship merchandise from time to time to the dealers, as specified in their orders; and this continuing obligation can be terminated only by giving notice of 30 days, to be followed by a liquidating period of 3 months. It is therefore obvious that the manufacturer cannot arbitrarily and at will demand the restoration of merchandise previously shipped. The dealers' promise not to prevent the manufacturer from recovering its goods accords with the rest of the contract only if given a limited scope. It doubtless applies to the two contingencies upon which the right of repossession is expressly given, to wit: (1) At the end of the 3-month period after notice of termination; and (2) upon an assignment for the benefit of creditors, or bankruptcy.

When the contract is read as an entirety, it becomes clear that the right and obligation of the dealers to buy the merchandise are absolute, while the right of the company to repossess the merchandise is limited to a particular purpose. The terms imposing the obligation to buy are very broad. The contract says that the dealers will pay in any event for all merchandise remaining unsold 3 months from the date of shipment. Manifestly the obligation to buy involves a right to purchase inconsistent with a right of repossession on the part of the manufacturer. Indeed, all of the provisions looking toward repossession are so phrased as to make it certain that they are to be exercised only if the firm is unable financially to pay for the goods. It is provided in a number of contingencies that the company shall have the right to resell merchandise returned or repossessed, and to charge the firm with the difference between the proceeds of the sale and the price at which it was originally invoiced. This occurs in case of (1) return of merchandise by the dealers without cause; (2) repossession by the manufacturer at the expiration of the 3-month period; (3) repossession by the manufacturer in the event

of bankruptcy. These provisions are designed to compel the dealers to buy and pay for the merchandise; and also to give the manufacturer a means of enforcing its reserved title or lien in case the dealers meet with financial disaster. It follows that the parties contemplated a sale from the beginning, so that all the goods on hand at the time of adjudication are the property of the bankrupt estate. A fortiori the goods which had then been on hand more than 3 months belong to the trustee. See Parlett v. Blake (C. C. A.) 188 F. 200, 39 L. R. A. (N. S.) 620.

This conclusion is strengthened by a consideration of the circumstances which surrounded the execution of the contract and by the actions of the parties since it was signed. For a considerable period prior to March 3, 1926, the ordinary relations of vendor and vendee had existed between the parties. On October 31, 1925, the dealers owed the manufacturer the sum of $13,829.23 for goods purchased, of which sum $1,126.11 was overdue. On January 31, 1926, the amount of their indebtedness was $15,975.90, of which $13,673.65 was overdue. In the next 2 weeks the dealers paid $1,250 in cash and gave their promissory note for $9,000. No goods were ordered or shipped between December 29th and February 16th. The agreements in the case at bar were then executed and the shipments were resumed under them for the period from February 17 to July 1, amounting in the aggregate to $42,251.92, on account of which $7,957.08 was paid. In the meantime the old indebtedness was reduced to the sum of $3,225.90. It therefore appears that, when the agreements were executed, the manufacturer had in mind the unsatisfactory condition of the account. It was to the interest of the manufacturer to keep the business alive and to continue shipments, if it could be done without risk of loss. To bring about this result, the parties were not unwilling that the true relationship between them should be concealed. The manufacturer agreed to forfeit $5,000 as liquidated damages for injury to the dealers' credit, if it should record the contracts in the record office of Baltimore City before the firm should become insolvent. In view of these facts, it is not unreasonable to conclude that the parties were equally willing to mask the subsequent sales of merchandise under the guise of a consignment.

The stipulation upon which the case was tried is meager as to the actions of the parties under the agreement, but it is shown that only a comparatively small part of the goods shipped between February 16 and July 13 were paid for, and that a considerable portion of them had been on hand more than 3 months when bankruptcy occurred. It is obvious that the manufacturer did not require the dealers to account for the merchandise sold each week and to forward the moneys collected. It does not appear whether the manufacturer availed itself of the right to inspect the dealers' accounts, but it must have been reasonably clear that settlements were not being made in accordance with the contract. Nor did the manufacturer seek at any time to recover any of the goods until after bankruptcy proceedings had been instituted. All of these considerations tend to confirm the conclusion that the parties understood that the contract was a contract of sale, notwithstanding formal statements therein to the contrary.

[2] The receivers, moreover, contend that, even if the agreement is one of consignment, nevertheless the consignor is not entitled to reclaim the goods, since the terms of sections 18 to 20 of article 2 of the Annotated Code of Maryland were not complied with. This statute of itself seems to dispose of the case adversely to the manufacturer, so far as the goods located in Baltimore are concerned. It provides in substance that any person, engaged in any mercantile or manufacturing business as an agent, or doing business in any name other than his own, shall, prior to commencing such business, file in the office of the clerk of the superior court of Baltimore City, if such business be located in said city, a certificate in writing under oath disclosing the name and address of the principal or true owner of the business, the character and location thereof, and the name under which it is conducted. Provision is made for the keeping by the clerk of an agency record in which the certificates filed shall be properly indexed so as to disclose the name of the real owner of the business, and the name under which it is conducted. If any person so conducting such business as agent or in any name other than the name of the owner shall fail to file the certificate, then any person who shall become a creditor for money or anything of value furnished or supplied for the use or benefit of the business, shall have the right to maintain suit against such person, or in the name under which the business is conducted, and process in such suit, when served upon the person so doing business and in charge, shall entitle the creditor upon legal proof of his claim to a judgment,

and all of the merchandise possessed or used or acquired in the business shall be liable to seizure and sold under execution in satisfaction of the judgment and costs.

The bankrupts came within the spirit and substantially within the literal meaning of the terms of the statute. It is stipulated that during the entire period of the consignment from February 16 to July 13 the value of the shoes in stock shipped by the manufacturers was in excess of 50 per cent. of the total value of all the shoes in stock. It is true that, so far as the stipulation discloses, the bankrupts did not act exclusively as agents. Apparently they bought goods outright from other manufacturers and sold them in the retail trade. Nevertheless as to more than half of the stock (if held by them on consignment) the business was clearly within the terms of the Maryland law. Therefore the title to the goods in Baltimore passed to the trustee in bankruptcy, even though the agreement of March 3, 1926, was one of consignment; for the state statute brings the case within the express words of section 70a (5) of the Bankruptcy Act (Comp. St. § 9654), vesting in the trustee of the estate of the bankrupt title to property which prior to the filing of the petition, might have been levied upon and sold under judicial process against it. The Circuit Court of Appeals for this circuit has given a similar interpretation to a kindred statute of the state of Virginia. Chesapeake Shoe Company v. Seldner, 122 F. 593; Virginia Book Company v. Sites, 254 F. 46; Patterson-Sargent Co. v. Rumble, 280 F. 377.

The petition of the Reliance Shoe Company will be dismissed.