EMPIRE FUEL CO. v. LYONS.

LYONS v. EMPIRE FUEL CO.

(Circuit Court of Appeals, Sixth Circuit. April 11, 1919.)

Nos. 3243, 3255.

1. Courts ⬤⟲274—Federal Court—Process—Corporations.
    Service in the federal district of Ohio on a West Virginia corporation will give the District Court for Ohio jurisdiction, if such corporation was doing business in Ohio in such a manner and to such extent as to warrant an inference that through its agents it was present there.

2. Corporations ⬤⟲642(4½)—Foreign Corporations—Doing Business in State.
    The fact that the general manager of a West Virginia corporation, who resided in Ohio and maintained an office there as managing agent of another corporation, maintained a file for the West Virginia company, so as to carry on from his Ohio office correspondence necessary between himself and the West Virginia corporation, does not show that such corporation was doing business in Ohio.

3. Corporations ⬤⟲642(6)—Doing Business in State.
    A sporadic or occasional sale in Ohio of coal, made by a West Virginia company, whose mines were in the latter state, does not constitute doing business in Ohio.

4. Corporations ⬤⟲673—Doing Business in State—Evidence.
    Where a West Virginia mining company, the capacity of whose mines was about 600 tons per day, contracted for the transportation of a large part of its product by boat into Ohio, and thence by rail to a city therein, such contract was important on the question of whether the West Virginia company was doing business in Ohio.

5. Corporations ⬤⟲642(6)—Doing Business in State.
    Doing business within the state does not necessarily require that it be done persistently and continuously, in order to justify service of process on an agent of a foreign corporation which does business within the state.

6. Courts ⬤⟲274—Federal Court—District of Suit—Doing Business in State.
    In an action against a West Virginia corporation, begun by service of process out of the federal District Court for Ohio upon its agent found within that state, held, that the West Virginia corporation was doing business within the state of Ohio, so as to be subject to the jurisdiction of the federal court.

7. Contracts ⬤⟲176(1)—Construction—Unambiguous Contract.
    The construction of an unambiguous contract is for the court, notwithstanding the construction involves consideration of attendant conditions and circumstances not in dispute.

8. Shipping ⬤⟲108—Special Contract for Transportation—Construction —Jury Question.
    In an action against a West Virginia mining company for breach of a contract under which plaintiff was to transport by boat coal from the mine in West Virginia to a point in Ohio, whence it would be reshipped by rail, the question whether the contract required defendant to furnish coal

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for water shipment, regardless of whether it could obtain cars at its mine, *held*, under the evidence, for the jury.

9. APPEAL AND ERROR ☞859—REVIEW—EVIDENCE.

On writ of error, the Circuit Court of Appeals cannot weigh the evidence or determine a question of fact.

10. SHIPPING ☞108—CONTRACT FOR TRANSPORTATION—CONSTRUCTION—EVIDENCE.

In an action by the plaintiff for breach of contract, which he asserted obligated the defendant mining company to furnish him 350 tons of coal per day for transportation by water, evidence *held* sufficient to support a finding by the jury that such was the parties' intention.

11. APPEAL AND ERROR ☞518(4)—REVIEW—RECORD.

Where it did not affirmatively appear from the record that plaintiff asked leave to amend an affidavit for attachment, a claim on writ of error that the dismissal of the attachment was improper, and that plaintiff should have been allowed to amend, cannot be considered.

12. APPEAL AND ERROR ☞1151(3)—DETERMINATION—MODIFICATION OF JUDGMENT—RECORD.

Where the record did not show that defendant's liability for an item was conceded, and that there was no room for contesting it, a modification of the judgment cannot be directed, so as to include such item, even though it was improperly excluded on the ground that it was a matter cognizable only in a court of admiralty.

13. APPEAL AND ERROR ☞1178(6)—DETERMINATION—REMAND.

A judgment may be remanded for trial upon a particular branch of the question, such as damages, or an issue relating to jurisdiction, without the judgment being reversed in toto.

14. APPEAL AND ERROR ☞1178(6)—DETERMINATION—REMAND.

Where the amount of damages recovered was not palpably right or plainly insufficient, plaintiff cannot be awarded a new trial on the issue of damages, as he desired to retain the recovery already had.

In Error to the District Court of the United States for the Southern District of Ohio; John E. Sater, Judge.

Action by John E. Lyons against the Empire Fuel Company. There was a judgment for plaintiff, and defendant brings error, and plaintiff also brings error, asserting that the award of damages was insufficient. Affirmed on both writs.

Murray Seasongood, of Cincinnati, Ohio, for plaintiff.

Frank E. Wood, of Cincinnati, Ohio, and M. G. Sperry, of Clarksburg, W. Va., for defendant.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiff in error in No. 3243 is a West Virginia coal-mining corporation. Having a contract for shipping coal to Toledo, Ohio (as stated in the brief of its counsel), it made with defendant in error, on April 28, 1917, a written contract for the transportation of coal from May 15, 1917, to May 15, 1918, by river barges, from Hugheston, W. Va., which is on the Kanawha river, to Pomeroy, Ohio, which is on the Ohio river, and for the loading of such coal into "such cars as may be furnished at Pomeroy, Ohio." On August 15, 1917, defendant in error, hereafter styled plaintiff, brought this suit in a state court of Ohio for damages for

alleged breach of the transportation contract, attaching certain barges of coal. Summons was served August 23, 1917, at Cincinnati, Ohio, on B. Lee Hutchinson, who was general manager of the fuel company, hereafter called defendant. The suit was removed to the court below. Defendant there moved to quash the service of summons on the substantial ground that defendant was not doing business in Ohio and so was not subject to suit therein. After hearing, both on affidavits and oral testimony, the District Judge overruled the motion to set aside the service, holding that defendant was doing business in Ohio. Under issue joined on the merits, plaintiff recovered verdict and judgment.

[1-6] 1. *Jurisdiction.* The effectiveness of the service of summons, and thus the jurisdiction of the court below, depends upon whether defendant was doing business in Ohio, "in such a manner and to such an extent as to warrant an inference that through its agents it was present there." Green v. Chicago, B. & Q. Ry. Co., 205 U. S. 530, 532, 27 Sup. Ct. 595, 596 (51 L. Ed. 916). If defendant was doing business in Ohio, service on Hutchinson gave jurisdiction. Defendant had acquired no permission under the statutes of Ohio to do business in that state. Its main office was at Fairmount, W. Va.; its mining office at Hugheston, in that state. Mr. Hutchinson, its general manager in charge of operations, spent about one-half his time at Hugheston, the remainder at Cincinnati, where he resided, going back and forth from Cincinnati to the mines. He was the managing agent of the Hutchinson Coal Company, which maintained an office at Cincinnati, where Hutchinson kept "an Empire Fuel Company file," "for his personal reference and for the Hutchinson Coal Company," and carried on from Cincinnati such correspondence as was necessary between himself and persons at the mines. But this, standing alone, was not enough to constitute a doing of business by defendant in Ohio. Goldey v. Morning News, 156 U. S. 518, 15 Sup. Ct. 559, 39 L. Ed. 517; Green v. Chicago, B. & Q. Ry. Co., supra; Peterson v. Chicago, R. I. & P. Ry. Co., 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841; Atchison, T. & S. F. R. R. Co. v. Weeks (C. C. A. 5) 254 Fed. 513, —— C. C. A. ——. Hutchinson also sold in Ohio, to another coal company, three barges of coal, which were loaded from time to time between August 20th and September 26th, in that company's barges at Hugheston, W. Va. But a sporadic or occasional sale in Ohio did not constitute a doing of business therein (Cooper Mfg. Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137); and except as already or hereafter stated defendant seems to have done no business in Ohio, and it kept no books or bank account there.

But this further situation is presented: The contract in suit was personally negotiated at Pomeroy, Ohio, between Hutchinson and plaintiff. It was executed at Charleston, W. Va.; Hutchinson signing for defendant as its general manager, his authority to do so being unchallenged. Hutchinson kept at the Cincinnati office a copy of the contract, the original being kept at defendant's main office at Fairmount. At Cincinnati, while the contract was still subsisting, Hutchinson discussed with plaintiff its "meaning and intent." From

Cincinnati he conducted correspondence with plaintiff, signing one or more letters in defendant's name by himself as general manager. From Cincinnati, as representing defendant, he sent plaintiff "different telegrams," at least one of which (that of August 2d), relating to the unloading of barges then at Pomeroy, was signed in defendant's name alone. From Cincinnati he inclosed to plaintiff vouchers for the transportation and loading of coal during the months of May and June under the contract in suit; the checks having been sent to Hutchinson from defendant's main office for the correct address, the letter of transmittal being signed in defendant's name by Hutchinson as its general manager. Hutchinson wrote plaintiff from Cincinnati to forward to him at that place an expense bill of about $500 incurred for raising a sunken boatload of coal, and the bill was sent accordingly. On June 23d plaintiff wrote Hutchinson at Cincinnati, as defendant's manager, regarding the loading of fuel coal called for by the contract. Hutchinson replied thereto by letter as defendant's general manager, apparently from Cincinnati. On or about June 1st the loading of coal into plaintiff's barges was suspended, because defendant had then a full supply of cars. From June 29th to August 11th, however, six barges were loaded, all of which were attached by plaintiff before they were unloaded; but the relations under the contract were not broken off until just before this suit was begun. Hutchinson acted for defendant in all the dealings between it and plaintiff relative to the contract in suit, and had no dealings with plaintiff except on behalf of defendant. The contract covered, potentially, at least, an important and substantial amount of defendant's business during the year. Plaintiff construes it as providing absolutely for the transportation of 350 tons per day; defendant construes it as providing for such transportation to the extent that railroad cars were not available. The capacity of the mines was approximately 600 tons per day. This consideration is entitled to weight. Maxwell v. A., T. & S. F. R. R. Co. (C. C.) 34 Fed. 286, 287. The contract called for its performance in Ohio, to the extent of the delivery of the coal at Pomeroy to defendant in railroad cars. The fact of delivery necessitated the furnishing by defendant of cars therefor and the billing of the same to destination.

The Hutchinson Coal Company, of which Hutchinson was the managing agent, "had the agency for the Empire Fuel Company." Hutchinson was at Pomeroy on several occasions (apparently during the period covered by operations under the contract) "seeing that barges were unloaded and cared for." Those barges were said to be "not involved in this suit," whatever that may mean. While there was testimony that the Hutchinson Company's "agent at the mines" was in charge of the unloading and billing out of cars, and that Hutchinson merely went to Pomeroy with him, and while other testimony was susceptible of a construction that the Hutchinson Company bought all defendant's output and itself sold it, the district judge states in his opinion that it was Hutchinson's claim that the Hutchinson Company "as the defendant's agent sells the defendant's coal," and defendant's counsel does not dispute this interpretation. While it may

be that this is not the correct interpretation of the relations between the Hutchinson Company and defendant, yet, as the record stands, we think it should be accepted. On this state of facts we must accept the court's conclusion that defendant was doing business in Ohio, certainly until the severing of relations between plaintiff and defendant, immediately before the bringing of this suit.

The question remains whether defendant should be regarded as still doing business in Ohio when service of process was made a few days later. The record permits a presumption of defendant's intention, in the regular course of its business, to ship by water to Pomeroy and there load into cars and bill coal, as was contemplated and as was done under the contract with plaintiff, whenever there should be a shortage of railroad cars. We think the burden of proof was upon defendant to overcome that presumption, and that this has not clearly been done. Previous to the contract with plaintiff defendant had had "a river connection" with other people for whom plaintiff was substituted; and the record introduced by defendant upon the hearing on the merits justifies the inference that in September, when the supply of cars was less complete, a river connection was resumed with still a third party, and deliveries made thereunder, presumptively at Pomeroy, for the purpose of shipment from that place. "Doing business" within a state does not necessarily require that it be done persistently and continuously. New Haven Co. v. Downington (C. C.) 130 Fed. 605. No all-embracing rule as to what is "doing business" has been laid down. St. Louis S. W. Ry. v. Alexander, 227 U. S. 218, 227, 33 Sup. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1914C, 77. The question whether defendant was doing business in Ohio is one of fact. Oakland Co. v. Wolf Co. (C. C. A. 6) 118 Fed. 239, 55 C. C. A. 93. It does not follow from the fact that the contract was made in West Virginia that all business done under it must be regarded as done in that state. Lumbermen's Ins. Co. v. Meyer, 197 U. S. 407, 414, 25 Sup. Ct. 483, 49 L. Ed. 810. Even if no one of the things Hutchinson did for defendant in Ohio was enough to constitute doing business there, and while the question presented is a close one, we think the record, taken together, sustains the conclusion of the District Judge that defendant was doing business in Ohio. We think the case within the principle (although not within the facts) of such decisions as St. Louis S. W. Ry. v. Alexander, supra; Mutual Life Ins. Co. v. Spratley, 172 U. S. 603, 19 Sup. Ct. 308, 43 L. Ed. 569; Lumbermen's Ins. Co. v. Meyer, supra. The instant case is in important features distinguishable from cases specially relied on by defendant.

[7, 8] 2. *The Trial on the Merits.* Defendant had at Hugheston both a rail and a river tipple. It could ship to Toledo either by rail directly from Hugheston, or by river barge down the Kanawha river to the Ohio river and then up the Ohio to Pomeroy, and by rail from that place. Plaintiff had 14 barges, of an average capacity of more than 500 tons each, and a steamer. The contract contained the following provisions, omitting immaterial matter, and substituting the titles of the parties here for their designations there:

(a) For the expressed consideration of $1 ["and the further consideration of the right to handle all of the coal of the Empire Fuel Company, except as

hereinafter provided, which is run over the river tipple to the Kanawha river at the Empire Fuel Company's mine at Hugheston * * * which is hereby granted"] plaintiff bound himself "to furnish sufficient barges at the said mine in which to load not less than 350 tons of coal per day," and further "to transport all such coal to Pomeroy * * * by way of the Kanawha and Ohio rivers, and to load all such coal into such cars as may be furnished at Pomeroy, Ohio."

(b) Should plaintiff "at any time, fail to furnish sufficient barges, beyond the necessary barges to load the said 350 tons per day, to load all of the said coal which the [defendant] is able to run to the river * * *" defendant was given "the right at any time to load such coal into other barges which" defendant "may be able to procure, at all times, however, giving [plaintiff] the preference as to such barges as [plaintiff] may have at the tipple at such time."

(c) Defendant (1) assumed responsibility "for all barges" of plaintiff while being loaded and until removed by plaintiff, provided they be removed within a reasonable time after loading; (2) agreed to pay plaintiff "$1 per ton for all such coal transported and loaded as aforesaid, settlement therefor to be made by the 20th of each month for all coal shipped from said mine during the previous month"; (3) agreed "to furnish billing for all coal so transported by [plaintiff]"; (4) agreed "to sell to [plaintiff] run of mine coal for fuel purposes not to exceed 26 tons per day at the rate of $1.50 per ton at the tipple."

(d) The contract was declared "subject to all contingencies which might arise which are not within the control of either of the parties hereto." (Brackets and paragraph letters are ours.)

The rail rate from Hugheston to Toledo was 25 cents per ton more than from Pomeroy to Toledo. Shipment under the contract in suit would thus cost defendant 75 cents per ton more than by all rail route. On the other hand, the United States had but a few months before entered the war; there was a great demand for coal and the price was very high; there was a marked shortage of cars, the allotment to defendant when the contract was made being but 32 per cent. of its production, which was then between 500 and 600 tons per day, and defendant hoped to increase the capacity by at least 100 tons per day. On June 4th defendant's car allotment was increased to 100 per cent., and it stood at that figure almost constantly until October 8th; during the greater part of the remainder of the year it ranged from nothing to 100 per cent. This suit grew out of defendant's refusal to furnish coal for plaintiff's barges when it had sufficient cars.

Defendant contends that the contract clearly and unambiguously bound it to furnish plaintiff coal only when cars could not be had. If this contention is right, the judgment is wrong, and should be reversed; for it is a commonplace that the construction of an unambiguous contract is for the court, notwithstanding the construction involves a consideration of attendant conditions and circumstances not in dispute. Plaintiff, however, contends that the contract required defendant to provide the stipulated tonnage, without regard to car supply. The trial court thought the contract ambiguous in this respect, and submitted its construction to the jury. The verdict sustains plaintiff's construction. If that construction is right, defendant has nothing of substance to complain of, for all its assignments of error relating to the merits (except the sixth) are, in that event, concededly not well taken, and the sixth assignment is without apparent merit.

The writing, judged only by its language, is not in our opinion free from ambiguity. True, the clause in paragraph (a) which we have bracketed recites only a right on plaintiff's part to handle coal "which is run over the river tipple." But this clause is only a recital; it is not a positive limitation. Assuming, however, that the bracketed clause, standing alone, would limit defendant's obligation under the contract to such coal as it could not get cars for, yet there is opposed to this recital an absolute agreement on plaintiff's part not only "to furnish sufficient barges  *  *  *  in which to load not less than 350 tons of coal per day," but "to transport all such coal"; and this latter clause may as naturally refer to the "350 tons of coal per day" as to the earlier clause "which is run over the river tipple." The bracketed recital is not, in our opinion, necessarily inconsistent with an implied obligation on defendant's part to furnish as much coal as plaintiff was absolutely required to transport, especially in the absence of any mention whatever of car supply or car shortage, much less of a positive declaration—which it would be natural to make if such was the intention of the parties—that defendant was required to run to the river tipple only its surplus above what the car supply, as existing from time to time, would take care of. Furthermore, paragraph (b) gives defendant the right to use other barges in case of plaintiff's failure to furnish barges enough to load, not merely "the said 350 tons per day," but "all the coal which defendant is able to run to the river"—an expression which, standing by itself, naturally implies ability rather than choice. Provisions (1) and (2) of paragraph (c) also naturally imply that plaintiff was expected to transport coal each month.

Without discussing in detail each of the considerations advanced pro and con, we think the language of the contract, giving effect to all of its terms, is ambiguous in the respect mentioned.

It is urged, however, that it is unreasonable that defendant should agree to pay 75 cents more per ton for river and rail than for all rail transportation, or that it should trust to the uncertainties of river navigation due to winter ice, as well as low water and floods. But we cannot say, as matter of law, that defendant might not reasonably have been willing to bind itself, under existing market prices, to transport one-half its output at an advanced rate of 75 cents per ton, rather than take its chances of the continuance of the then existing car shortage, or that it would be more unreasonable that defendant should take chances on river navigation as to one-half its output than that plaintiff should tie up his 14 barges, said to have a rental value of $10 per day each, as well as his steamer (and defendant presented evidence that all plaintiff's equipment was required to transport 350 tons per day), on the chance of getting no coal to carry unless the car shortage should continue. Our conclusion is that the District Court was right in submitting to the jury the question of the actual intent of the contract.

[9, 10] As to the evidence of intention: Plaintiff testified that he refused to sign the contract as first drawn because "I did not think it specified the amount of coal I was to boat," and because of its omission of certain other provisions; that he stated he "had to know what

he was going to do, and how many tons he was to get per day, so he would know how much work he had for his steamboat and barges"; that "the lawyer took the original draft and interlined it and changed it, so it specified 350 tons," as well as covered the other omissions referred to. Opposed to this is the testimony of three witnesses, who, while agreeing that plaintiff made substantially the objections stated, declare that he was explicitly told that he was to get no coal when defendant had enough cars, and that the other criticized omissions only were covered by the redraft. There was also evidence of statements by plaintiff, both oral and by letter, and of other circumstances, more or less inconsistent with his present claim. Were we called upon to decide this question of fact from the printed record, we might think defendant's version the more reasonable one; but plaintiff's testimony was direct and unequivocal, and, if believed, supports the verdict. Moreover, the trial court denied a motion for a new trial. We cannot weigh the evidence or determine the question of fact.

[11] 3. *The Cross-Writ.* (a) On motion to discharge the attachment, the District Judge held the affidavit therefor insufficient. Plaintiff was, however, given permission to file another affidavit and "start anew his attachment proceedings"; in default thereof the motion to dissolve to be sustained; in either event plaintiff to pay the costs of the attachment and of motion to dissolve. Plaintiff thereupon filed a new affidavit and took out a new attachment. Under writ of error in No. 3255 plaintiff asks review of the judgment of dismissal. Practically a question of costs only is involved. We are not convinced that the criticized action constituted reversible error. If, as claimed, the affidavit was amendable, it does not affirmatively appear that plaintiff asked leave to amend.

[12] (b) Plaintiff also asks that this court enter judgment for $510 additional damages, for the expense of raising a sunken barge. The item was excluded from the jury's consideration, as "not in controversy in this case," plaintiff's counsel say, on the ground that the item was recoverable only in admiralty. It is said: "There is or can be no dispute" about the item. We are unable to direct a modification of the judgment in this respect, for the reason, if for no other, that we cannot say from the record that defendant's liability for the item was conceded, or that there was no room for contesting it.

[13, 14] (c) Plaintiff asked upwards of $87,000; he recovered $10,400. He now asks that this court "order an assessment of additional damages," on the ground that the verdict was insufficient, and was made smaller than it should have been because of alleged erroneous rulings and action of the trial judge. This we cannot do. There is authority for ordering a new trial upon a particular branch of a controversy. We have reversed judgments, with remand for trial upon an issue relating to jurisdiction, without setting aside the verdict for damages. Chicago, R. I. & P. R. Co. v. Stephens, 218 Fed. 535, 540, 134 C. C. A. 263; Fentress Co. v. Elmore, 240 Fed. 328, 333, 153 C. C. A. 254. The Circuit Court of Appeals for the First Circuit has awarded a new trial on the subject of damages alone. Farrar v. Wheeler, 145 Fed. 482, 75 C. C. A. 386. And see Calaf v.

Fernandez (C. C. A. 1) 239 Fed. 795, 152 C. C. A. 581, and Mine v. Mining Co. (D. C.) 254 Fed. 630.

But plaintiff does not ask to have the judgment in his favor set aside, except or unless for purpose of assessing additional damages; he apparently seeks to hold onto his present recovery, and, without jeopardizing that, to try to increase it. There may be cases where the recovery had is so palpably right so far as it goes, and yet so palpably insufficient in amount, as to justify the course asked here. We need not determine that question, for this case is not of that class in either of the two features mentioned.

The judgment of the District Court is affirmed. The defendants in error in the respective writs will recover costs thereunder