### EASTERN LIVESTOCK CO-OPERATIVE MARKETING ASS'N, Inc., v. DICKENSON.

No. 4491.

Circuit Court of Appeals, Fourth Circuit.

Nov. 6, 1939.

William A. Stuart, of Abingdon, Va., and A. G. Lively, of Lebanon, Va., for appellant.

George M. Warren and H. E. Widener, both of Bristol, Va., (Raymond J. Boyd, of Lebanon, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This action for the alleged breach of an executory contract of sale of 140 head of cattle resulted in a judgment for the plaintiff in the sum of $3,954 in the District Court to which the suit had been removed from the Circuit Court of Russell County, Virginia. On this appeal the defendant contends that the judgment should be reversed on the grounds (1) that the defendant is a Maryland corporation not doing business in Virginia, and therefore the court was without jurisdiction to entertain the suit, and (2) that there was no substantial evidence to show that the defendant had entered into a contract to purchase the cattle, and therefore the court should have granted a motion for a directed verdict in its favor.

The Eastern Livestock Co-Operative Marketing Association, Inc., is a Maryland corporation. It has never applied under the corporation law of Virginia for a license to do business in the State as a foreign corporation, and has had no statutory agent authorized to accept service of process, nor has it had any office or property therein. It has had a principal office in Baltimore, Maryland, and branch offices in Lancaster, Pa., and Jersey City, N. J. It is a co-operative concern, with about 4,000 members, owned and controlled by farmers. A producer becomes a member or stockholder of the Association when it handles his live stock. The charter authorizes the Association to "acquire, handle and market live stock and all other agricultural products on any basis that may be agreed upon and in any capacity, and to do anything which is conducive to such purposes." Co-operative selling of live stock on commission at the terminal markets of Baltimore, Lancaster and Jersey City is its principal business.

Ordinarily, the business of selling is transacted at these three terminal markets. Producers send their live stock to the Association, which sells them for the best obtainable price at the markets, and charges a commission of $1 per head. Profits earned by the Association are paid to the members in proportion to the business which they furnish. Under the customary procedure, the purchaser is regarded as the owner of the cattle when the price is fixed and the stock is weighed and delivered, and thereupon the Association becomes responsible to the seller for the purchase price and sends him its own check less the commission, and in turn collects the purchase price from the purchaser.*

In order to stimulate producers to make use of the Association, two field agents were employed by it to travel throughout the territory, attend farmers' meetings and explain the services which the Association performed in acquainting its patrons with market conditions, and assisting them in the grading and shipment of the stock. One of these agents resided at Lebanon, Virginia, and spent the greater part of his time in the State. During 1936 and 1937 the Association notified Virginia producers by letters and posters that its field agent had headquarters at Lebanon. During 1936, 1937 and 1938 this agent not only solicited shipments of cattle to the terminal markets, but also bought certain lots of cattle on behalf of the Association on the order of Virginia producers, and delivered them in the State. He also sold cattle in

---

*The business of the Association is subject to the terms of the Packers and Stockyard Act of August 15, 1921, ch. 64, 42 Stat. 159, 7 U.S.C.A. §§ 181–231.

118

Virginia as the agent of out-of-state and local producers. The agent, however, was devoid of authority from the Association to purchase live stock on its behalf for resale without a prior order from a buyer. A losing transaction of this sort in 1935 led the Board of Directors of the Association to pass a resolution forbidding the practice.

The amount of live stock sold by the Association in Virginia was small compared with the amount originating in Virginia and sold by the Association on commission in the out-of-state markets. The total number of gross head of live stock handled by the Association during 1936, 1937 and 1938 was 140,266, 186,884 and 161,715 respectively. In 1936 there were sales of 100 head of cattle in Virginia to some six to ten farmers; in 1937 2028 were sold in Virginia in twenty to twenty-five transactions; and in the first ten months of 1938 the sales in Virginia included 149 head of cattle and also 750 ewes which were received by the Association on consignment from the west and were sold in the State in small lots. In summary, it may be said that while by far the larger part of the Association's business consisted in stock yard sales outside the State made on commission paid by the seller, there was a small but persistent volume of sales on commission in Virginia of cattle bought as the agent of the buyer or sold as the agent of the producer.

The transaction which forms the subject matter of the controversy in suit took place during the latter part of August, 1937 when, it is admitted, the plaintiff sold 140 head of cattle at Lebanon, Virginia, the only question being whether the sale was to the Association as buyer, or through the Association as a commission agent. On account of unusual conditions, the business practice of the Association in Virginia and elsewhere during the season of 1937 differed from that pursued in prior years. An unusual scarcity of cattle, due to a drought in the west, occurred in the summer of 1937 and the supply was so scarce that the buyers sent agents to make purchases on the farms. To meet this situation, the Association sent an additional man into Virginia to advise the producers as to prices and to arrange sales by bringing the agents of the buyers and the producers together. The result was that the farms, rather than the terminal markets, became the scene of certain sales, and so far as Virginia cattle were concerned, the As-

sociation conducted a substantial part of its Virginia business in that State rather than at the terminal markets. The contracts executed on the farms were for the most part the usual contracts of executory sale on commission paid by the seller, the Association paying the net proceeds to the seller and collecting the gross purchase price from the buyer. This course of business was continued until a sharp drop in prices occurred about October 1. The season usually runs from June 1 to November 1 approximately.

■ From the facts outlined, we conclude that the Association was doing business in Virginia in August, 1937 when the sale of the plaintiff's cattle took place. The general rule is that the validity of service of process upon a foreign corporation depends upon whether it is doing business in such a manner and to such an extent as to warrant the inference that it has subjected itself to the local jurisdiction and is present therein by its duly authorized officers or agents. Green v. Chicago B. & Q. R., Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916; People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 87, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas.1918C, 537. Mere solicitation of orders in a State followed by shipment of goods into the State does not constitute that doing of business which subjects the corporation to the service of process therein. People's Tobacco Co. v. American Tobacco Co., supra; Tignor v. Balfour & Co., 167 Va. 58, 187 S.E. 468.

In the pending case there was not only a continuous solicitation by the resident agent of the shipment of cattle by Virginia producers to the out-of-state markets, but also assistance to the Virginia farmers in the preparation of their cattle for shipment, the purchase of cattle from time to time by the agent on the order of Virginia purchasers, followed by delivery of cattle within the State, and the sale to Virginia buyers of the cattle of out-of-state and local producers. Moreover, the agent entered into commission contracts of sale on behalf of the Association when he brought together the buyers and sellers of cattle, supervised the negotiations and consummation of contracts of sale between them, which were followed by delivery of the stock by the producers to the buyers within the State. The solicitation of shipments and the sales of cattle on commission for the producers constituted the main business of the Association, and

the evidence shows that these activities, as well as the sales of cattle by the agent in Virginia, took place over such a period of time and in such volume during the year in question as to imply the presence of the Association within the jurisdiction of the court. The promotion of local trade and the making of contracts on behalf of a foreign corporation by an agent within a State have been regarded by the courts as substantial evidence that it was doing business therein. Cheney Bros. Co. et al. v. Massachusetts, 246 U.S. 147, 38 S.Ct. 295, 62 L.Ed. 632; Cone v. Tuscaloosa Mfg. Co., C. C. N. Y., 76 F. 891; Empire Fuel Co. v. Lyons, 6 Cir., 257 F. 890; Spokane Merchants' Ass'n v. Clere Clothing Co., 84 Wash. 616, 147 P. 414; Dalton A. Mach. Co. v. Commonwealth, 118 Va. 563, 88 S.E. 167, affirmed 246 U.S. 498; American Asphalt Roof Corp. v. Shankland, 205 Iowa 862, 219 N.W. 28, 60 A.L.R. 986; see also International Harvester Co. v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479; St. Louis Southwestern R. Co. v. Alexander, 227 U.S. 218, 33 S.Ct. 245, 57 L.Ed. 486, Ann.Cas.1915B, 77.

There is no merit in the suggestion that the Association had ceased to do business in Virginia when the process was served, in view of the fact that it was not served until December, 1937, some weeks after the close of the season and after the buyers had ceased to come to Virginia to purchase cattle on the farms. The agent of the Association was still in the State, ready to carry on its business, and in the following year he performed his usual duties and handled live stock which was brought into the State on consignment and sold to Virginia producers. It is a fair inference that in December, 1937, the Association intended to continue its Virginia business as the circumstances should require, and it has offered no sufficient evidence to show that its business activities had ceased. See Empire Fuel Co. v. Lyons, 6 Cir., 257 F. 890, 894; see also the ruling of the Supreme Court of Virginia as to the service of process upon the agent of a domesticated foreign corporation which had withdrawn from the State and had been dissolved, in DuPont Engineering Co. v. Harvey Construction Co., 156 Va. 582, 158 S.E. 891.

On the merits of the case, the issue is whether the Association purchased the cattle from the plaintiff, as the complaint charges, or sold the cattle on commission as the agent of the plaintiff to one Morris Kressler, a cattle buyer from Lancaster, Pennsylvania, as alleged in the answer. The contract was not written; but there is little or no dispute as to circumstances under which it was made. In the summer of 1937 the agent of the Association called a meeting of farmers at Lebanon to explain its new policy of bringing buyers to the field and arranging sales of live stock on commission on the farms. After the meeting the plan was explained personally to the plaintiff, and he requested that his cattle be handled in accordance therewith. The Association had handled cattle for him on commission on previous occasions, and he was familiar with the practice of the Association of paying for the stock with its check and collecting the purchase price from the buyer. The plaintiff was an experienced cattle dealer and business man, and during the period was acting as receiver for several county banks. The resident Virginia agent of the Association was his nephew.

In accordance with the understanding thus reached, the Virginia agents brought Kressler to the plaintiff's farm on or about August 25, 1937 to see the latter's cattle, and subsequently the plaintiff met Kressler at a nearby hotel to discuss the terms of sale, and an agreement was reached for the sale of 140 head of cattle, 40 to be taken out, weighed and paid for by Kressler during the month of August, 1937 and the remaining 100 head to be taken out, weighed and paid for at any time prior to the first day of October, 1937. The purchase price was 13c per pound for 120 head and 12c a pound for 20 head. 21 head of cattle were delivered and paid for on or about August 27, 19 head on August 31, and 40 on October 9; but the buyer failed to take the remaining 60, and for this alleged breach of the agreement the present suit was brought. There was some delay on the plaintiff's part in getting the remaining 60 head of cattle ready for shipment when ordered by the buyer on October 11, and the buyer took the position that he was thereby relieved from further liability under the contract. In the meantime the market price had fallen.

Whether Kressler or the Association was the purchaser at the sale arranged under these circumstances is the crucial question. The evidence shows in addition to the facts set out above that the plaintiff received the active cooperation of the agents of the Association in obtaining a

high price for the cattle bought by Kressler, and that a few days after the first shipment to Kressler the plaintiff, according to his own testimony, got a check from the Association for the cattle "less $1 a head as agreed on for the commission for the load". The account of sales accompanying and attached to the check designated Kressler as the purchaser and deducted $1 per head as a commission. Similar papers were received by the plaintiff with respect to the subsequent shipments. When these circumstances are considered, together with the improbability that a buyer would limit himself to a profit of $1 per head on cattle selling for approximately $140 per head, it is evident that a strong case for the defendant's contention, that the stock was sold by the plaintiff to Kressler, is made out.

The plaintiff rests his case almost entirely upon a conversation that took place between the Virginia agent and himself, as the two men were on their way from the plaintiff's home to the hotel to meet Kressler and to negotiate for the sale of the cattle. The plaintiff did not know Kressler and asked the agent whether Kressler's check would be good, to which the agent replied that there was nothing for the plaintiff to worry about as the Association would give him its check and he would not have to take Kressler's. The plaintiff also relies on the fact that subsequent to the refusal of the cattle buyer to take the remainder of the cattle, an agent of the Association endeavored on numerous occasions to persuade the buyer to agree to take the cattle at a certain price at a fixed date in the future, and that in the meantime they would be dry fed at the expense of the Association. No such contract was in fact entered into. The plaintiff also testified that later in November an agent of the Association, in reporting attempts to persuade the buyer to take the balance of the cattle, had said that the Association did not deny the responsibility of buying the cattle. This statement was denied by the agent.

This testimony furnished no substantial support to the plaintiff's contention. The legal relations of the parties were fixed by the contract, which was made in the course of the negotiations that took place in the hotel followed by the partial performance above described. There is nothing in the evidence with regard to these controlling activities to show that the Association occupied the position of buyer. Quite the contrary is the situation. The conversation upon which the plaintiff relies avails him naught, for it had always been the practice of the Association in selling his stock on commission to assume responsibility for the payment of delivered goods, and to send its own check in settlement; and as we have shown, the check in this particular case when received showed on its face that Kressler was the buyer and that the Association was a commission agent. The actions and statements of the agents made weeks later in the month of November, after further deliveries were refused, were consistent with a desire and purpose to induce the fulfillment of the entire contract, and even when given full force and effect, they do not furnish substantial evidence to disprove the established facts with reference to the making of the contract.

The defendant's motion for a directed verdict should have been granted. The judgment of the court below will be reversed and the case will be remanded with direction to enter judgment for the defendant. See Rule 50 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Baltimore & C. Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636.

Reversed.